## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-cv-25176-BLOOM/Otazo-Reyes

ODETTE BLANCO DE FERNANDEZ
*née* BLANCO ROSELL; EMMA RUTH BLANCO,
in her personal capacity, and as Personal
Representative of the ESTATE OF ALFREDO
BLANCO ROSELL, JR; HEBE BLANCO
MIYARES, in her personal capacity, and as Personal
Representative of the ESTATE OF BYRON
BLANCO ROSELL; SERGIO BLANCO DE LA
TORRE, in his personal capacity, and as
Administrator *Ad Litem* of the ESTATE OF
ENRIQUE BLANCO ROSELL; EDUARDO
BLANCO DE LA TORRE, as Administrator *Ad
Litem* of the ESTATE OF FLORENTINO
BLANCO ROSELL; LIANA MARIA BLANCO;
SUSANNAH VALENTINA BLANCO; LYDIA
BLANCO BONAFONTE; JACQUELINE M.
DELGADO; BYRON DIAZ BLANCO, JR.;
MAGDELENA BLANCO MONTOTO;
FLORENTINO BLANCO DE LA TORRE; JOSEPH
E. BUSHMAN; CARLOS BLANCO DE LA
TORRE; and GUILLERMO BLANCO DE LA
TORRE;

      Plaintiffs,

      v.

SEABOARD MARINE LTD.

      Defendant.

_____ /

### AMENDED COMPLAINT

Odette Blanco de Fernandez *née* Blanco Rosell ("Odette Blanco Rosell"); Emma Ruth

Blanco, in her personal capacity, and as Personal Representative of the Estate of Alfredo Blanco

Rosell, Jr; Hebe Blanco Miyares, in her personal capacity, and as Personal Representative of the

Estate of Byron Blanco Rosell; Sergio Blanco, in his personal capacity, and as Administrator Ad

Litem of the Estate of Enrique Blanco Rosell; Eduardo Blanco de la Torre, as Administrator Ad Litem of the Estate of Florentino Blanco Rosell; Liana Maria Blanco; Susannah Valentina Blanco; Lydia Blanco Bonafonte; Jacqueline M. Delgado; Byron Diaz Blanco, Jr.; Magdelena Blanco Montoto; Florentino Blanco de la Torre; Joseph E. Bushman; Carlos Blanco de la Torre; and Guillermo Blanco de la Torre ("Plaintiffs"), by and through counsel, as and for their Complaint against Seaboard Marine Ltd. ("Defendant" or "Seaboard Marine") hereby allege:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action to recover damages and interest under the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, codified at 22 U.S.C. § 6021, et seq. (the "Helms-Burton Act" or "Act") against Defendant for trafficking in property which was confiscated by the Cuban Government on or after January 1, 1959 and as to which Plaintiffs own claims.

2.      On September 29, 1960, the Cuban Government published the announcement of the confiscation without compensation of the following property of Plaintiff Odette Blanco Rosell and her siblings, all of whom are deceased:  Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell; and Byron Blanco Rosell (collectively, the "Blanco Rosell Siblings")[1]:

> One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.
>
> Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.
>
> Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).
>
> Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

---

[1] As stated above, the Estates of Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell; and Byron Blanco Rosell, respectively are Plaintiffs in this case.

Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at

23405 - 23406 (English translation).

3.       The "persons listed in the first Whereas" in Resolution No. 436 above is a reference

to the Blanco Rosell Siblings, who had been the subject of "investigations" carried out by the

Cuban Government.  *See id*. at 23405 (first Whereas clause) ("Whereas: Having considered cases

number 3-2-3143, 3-2-8990 and 3-2-9832, regarding the investigations carried out on the

following persons:  Alfredo, Enrique, Florentino, Byron, and Odette Blanco Rosell.").

4.       The Blanco Rosell Siblings' property confiscated by the Cuban Government

included all of their "property and rights, whatever their nature," including but not limited to:

> (a) their wholly owned company, Maritima Mariel SA, and the 70-Year Concession
> held by Maritima Mariel SA, to develop docks, warehouses and port facilities on
> Mariel Bay, a deep water harbor located on the north coast of Cuba; and

> (b) their wholly owned companies, Central San Ramón and Compañia Azucarera
> Mariel S.A., including those companies' extensive land holdings (approximately
> 11,000 acres) on the southeast, south and west sides of Mariel Bay, which included
> a number of improvements such as roads, railways, buildings, and utilities

*See* Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at

23406 (English translation) ("Confiscated Property").

5.       The Blanco Rosell Siblings were not U.S. citizens when the Cuban Government

confiscated their Confiscated Property in 1960.  They fled Cuba after the confiscation and became

U.S. citizens before March 12, 1996, the date the Helms-Burton Act was signed into law.  Today,

only Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, age 91, is alive.

6.       In 1996, the U.S. Congress passed the Helms-Burton Act, and President Bill

Clinton signed the Act into law on March 12, 1996.  Title III of the Act, which took effect in

August 1996, imposes liability against persons who "traffic" in property confiscated by the Cuban

Government on or after January 1, 1959, the claims to which are owned by persons who became U.S. nationals after the confiscation of their property and before March 12, 1996.

7.      Although Title III's creation of liability as to those engaged in trafficking has remained in force since August 1996, the ability of any potential plaintiff to bring a private right of action for Title III violations had been suspended by the President every six months (pursuant to authority granted in the Act) until May 2, 2019, when President Donald Trump allowed the suspension of Title III's private right of action to lapse, thereby allowing such private actions to proceed.

8.      President Trump's allowing of the suspension of Title III's private right of action to lapse should not have come as a surprise to traffickers.  As early as November 2018, then White House National Security Advisor John Bolton stated that the Trump Administration planned to give the continuing of the Title III suspension "very serious review." In January 2019, then Secretary of State Michael Pompeo announced that the Trump Administration was reviewing whether further suspensions of Title III were justifiable or necessary.

9.      On April 17, 2019, Secretary of State Pompeo announced that the Trump Administration would no longer suspend the right to bring an action under Title III, effective May 2, 2019.

10.      On May 9, 2019, only one week after the Trump Administration allowed the suspension of Title III to lapse, and thus activated the ability of plaintiffs to bring causes of action under Title III, Defendant Seaboard Marine's first trafficking voyage called at the Port of Mariel and trafficked in the Confiscated Property.

11.      Specifically, according to the International Maritime Organization ("IMO"), a specialized agency of the United Nations responsible for regulating shipping, the vessel AS

PETULIA (IMO # 9374454), while operated by Defendant Seaboard Marine, sailed from the Port of New Orleans directly to the Port of Mariel where it called on May 9, 2019 and engaged in commercial transactions with the Port of Mariel and the Zona Especial De Desarollo Mariel ("ZEDM") (a/k/a Mariel Special Economic Zone). *See infra* ¶ 92.

12.     The A/S PETULIA's May 9, 2019 trafficking voyage at the Port of Mariel was the first of approximately twenty-four trafficking voyages to the Port of Mariel by vessels operated by Defendant Seaboard Marine, including seven other trafficking voyages by the AS PETULIA and multiple trafficking voyages by the AS PATRIA (IMO # 9294525), NORDBALTIC ("IMO # 9241475"), and SEABOARD ATLANTIC (IMO # 9395563) (collectively, the "Trafficking Vessels"). *See infra* ¶ 92.

13.     The Trafficking Vessels were knowingly and intentionally directed by Defendant Seaboard Marine to the Port of Mariel, where the Trafficking Vessels for themselves, and on behalf of and/or at the direction of Defendant Seaboard Marine, engaged in commercial activity using or otherwise benefiting from the Confiscated Property, without the authorization of the Plaintiffs who own claims to the Confiscated Property, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii). *See infra* ¶ 95.

14.     In addition, while at the Port of Mariel, the Trafficking Vessels engaged in commercial activities approximately twenty-four times since May 9, 2020, whereby Defendant Seaboard Marine for itself and/or non-party Seaboard Corporation ("Seaboard Corp.")[2] caused, directed, participated in, or profited from trafficking by another person, or otherwise engaged in trafficking through another person without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii). *See infra* ¶ 96.

---

[2] Defendant Seaboard Marine is a wholly-owned subsidiary of Seaboard Corp. *See infra* ¶ 35.

## **PARTIES**

15.     Plaintiffs incorporate by reference Paragraphs 1 through 14 as if fully set forth herein.

### I.     **Plaintiffs**

16.     Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She owned her claim to the Confiscated Property on March 12, 1996, which claim she still owns.  She became a naturalized U.S. citizen on September 8, 1971.  She resides in Miami-Dade County, Florida.

17.     Plaintiff Estate of Alfredo Blanco Rosell, deceased, is represented through its Personal Representative, Emma Ruth Blanco.  Alfredo Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on August 26, 1970.  He owned his claim to the Confiscated Property on March 12, 1996.   Prior to his death on December 10, 2006, he resided in Miami-Dade County, Florida.

18.     Plaintiff Estate of Byron Blanco Rosell, deceased, is represented through its Personal Representative, Hebe Blanco Miyares.  Byron Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in or around 1972.  He owned his claim to the Confiscated Property on March 12, 1996.   Prior to his death on February 25, 2001, he resided in Miami-Dade County, Florida.

19.     Plaintiff Estate of Enrique Blanco Rosell, deceased, is represented through its Administrator *Ad Litem* Sergio Blanco.  Enrique Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on September 23, 1970.  He owned his claim to the Confiscated Property on March 12, 1996.  Prior to his death on November 27, 2014, his last known place of residence was San Juan, Puerto Rico.

20.     Plaintiff Estate of Florentino Blanco Rosell, deceased, is represented through its Administrator *Ad Litem* Eduardo Blanco de la Torre.  Florentino Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in or around 1975.  He owned his claim to the Confiscated Property on March 12, 1996.   Prior to his death on March 18, 2005, his last known place of residence was Baldrich, Puerto Rico.

21.     Plaintiff Emma Ruth Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on January 4, 1973.  She resides in Miami-Dade County, Florida.

22.     Plaintiff Liana Maria Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. Upon knowledge, information and belief, she became a naturalized U.S. citizen prior to March 12, 1996.  She resides in Miami-Dade County, Florida.

23.     Plaintiff Susannah Valentina Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's granddaughter.  To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  Upon knowledge, information and belief, she became a naturalized U.S. citizen prior to March 12, 1996.  She resides in Miami-Dade County, Florida.

24.     Plaintiff Hebe Blanco Miyares is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Byron Blanco Rosell's daughter.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She

became naturalized a U.S. citizen on September 23, 1970.  She resides in Miami-Dade County, Florida.

25.     Plaintiff Lydia Blanco Bonafonte is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Byron Blanco Rosell's daughter.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on November 17, 1971.  She resides in Miami-Dade County, Florida.

26.     Plaintiff Jacqueline M. Delgado is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Byron Blanco Rosell's daughter.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on February 18, 1970.  She resides in Miami-Dade County, Florida.

27.     Plaintiff Byron Diaz Blanco, Jr. is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Byron Blanco Rosell's son.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, Byron Diaz Blanco, Jr. inherited and owns a portion of that claim.  He became a naturalized U.S. citizen before March 12, 1996.  He resides in Orange County, California.

28.     Plaintiff Magdelena Blanco Montoto is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Florentino Blanco Rosell's daughter.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on June 21, 1977.   She resides in Coral Gables, Florida.

29.     Plaintiff Sergio Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son and Enrique Blanco Rosell's nephew.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns a portion of that claim.  In addition, to the extent Enrique Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns all of that claim.  He became a naturalized U.S. citizen on January 25, 1983.  He resides in Guaynabo, Puerto Rico.

30.     Plaintiff Florentino Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Florentino Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen before March 12, 1996.  He resides in Gauynabo, Puerto Rico.

31.     Plaintiff Joseph E. Bushman is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is the surviving husband of Florentino Blanco Rosell's daughter, Maria Elena Blanco.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Joseph E. Bushman inherited and owns a portion of that claim.  He was born a U.S. citizen on March 14, 1947, and has remained a U.S. citizen his entire life.  He resides in Sumter County, Florida.

32.     Plaintiff Carlos Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Carlos Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on February 26, 1985.  He resides in Gauynabo, Puerto Rico.

33.     Plaintiff Guillermo Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Guillermo Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on August 3, 1983.  He resides in San Juan, Puerto Rico.

**II.     Defendant**

34.     Defendant Seaboard Marine is a foreign corporation registered to do business in Florida with its principal place of business at 8001 N.W. 79th Ave., Miami, Florida 33166. Defendant is an ocean transportation company that operates vessel service between the United States and the Caribbean Basin, including  at least twenty-four direct trafficking voyages from the Port of New Orleans to the Port of Mariel, Cuba.  Defendant also operates vessels that call on ports in Central and South America.

**III.     Key Non-Party**

35.     Non-Party Seaboard Corp. is a publicly-traded company incorporated in Delaware, with its headquarters located at 9000 W. 677th Street, Merriam, Kansas 66202.  Seaboard Corp. is a holding company for several national and international subsidiaries, including Defendant Seaboard Marine, which is a wholly-owned subsidiary of Seaboard Corp.  By and through its subsidiaries, Seaboard Corp. is involved in the maritime, food, commodity milling and trading, and power industries.

## JURISDICTION AND VENUE

36.     Plaintiffs incorporate by reference Paragraphs 1 through 35 as if fully set forth herein.

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, specifically Title III of the Helms-Burton Act, 22 U.S.C. §§ 6081–85.

38.      The amount in controversy in this action exceeds $50,000, exclusive of interest, treble damages, court costs, and reasonable attorneys' fees.  22 U.S.C. § 6082(b).

39.     Defendant is subject to the personal jurisdiction of this Court because its principal place of business is located in Florida and because it conducts business in this District.  Further, Defendant is subject to the personal jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and pursuant to Fla. Stat. § 48.193 including subsections §§ 48.193 (1)(a)1, 48.193(1)(a)2,  48.193 (1)(a)6, and 48.193(2) thereof, because, *inter alia,* (a) Defendant is engaged in substantial and not isolated activity within this State; (b) Defendant committed and continues to commit acts of trafficking as defined in the Helms Burton Act, 22 U.S.C. § 6023(13) within the state of Florida and within this judicial District and thus is subject to personal jurisdiction in the state courts of Florida and in this Court; (c) because Defendant, personally or through its agents, is operating, conducting, engaging in, or carrying on a business or business venture in Florida, or has an office or agency in Florida, and within this District, including its principal place of business at 8001 N.W. 79th Ave., Miami, Florida 33166; and/or (d) is causing injury to persons who reside in this state arising out of acts or omissions by Defendant and/or its agents outside this State while Defendant and/or its agents were engaged in the solicitation of service activities within this State.

40.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, as do the majority of Plaintiffs.

41.     Plaintiffs have paid the special fee for filing an action under Title III of the Helms-Burton Act, 22 U.S.C. § 6082(i), which is $6,548 pursuant to the fee schedule adopted by the Judicial Conference in September 2018.

## THE HELMS-BURTON ACT

42.     Plaintiffs incorporate by reference Paragraphs 1 through 41 as if fully set forth herein.

### I.     Background

43.     The Helms-Burton Act, signed into law on March 12, 1996, had several goals, including to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime," 22 U.S.C. § 6022(6).  Further, Congress determined that "'trafficking' in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise to the … Cuban Government and thus undermines the foreign policy of the United States," which foreign policy includes "protect[ing] claims of United States nationals who had property wrongfully confiscated by the Cuban Government." 22 U.S.C. § 6081(6).

44.     Congress found that international law "lacks fully effective remedies" for the "unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property." 22 U.S.C. § 6081(8).

45.     Congress thus decided that "the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11).  The result was

Title III of the Helms-Burton Act – "Protection of Property Rights of United States Nationals" – which imposes liability on persons trafficking in property confiscated from a U.S. national by the Cuban Government on or after January 1, 1959, and which authorizes a private right of action for damages against such traffickers.  *See* 22 U.S.C. § 6082.

46.     The Helms-Burton Act authorizes the President (or the President's delegate, the Secretary of State) to suspend for periods of up to six months at a time (1) the Title III private right of action, 22 U.S.C. § 6085(c); and/or (2) the effective date of Title III of August 1, 1996, 22 U.S.C. § 6085(b).

47.     Although President Clinton suspended the private right of action under Title III on July 16, 1996 for six months, the August 1, 1996 effective date was never suspended. Title III of the Act came into effect on August 1, 1996. Starting on that date, traffickers of confiscated property were liable to U.S. nationals with claims to that property but could not be sued while the private right of action remained suspended.

48.     President Clinton and subsequent administrations renewed the suspension of the Title III private right of action, typically for six months at a time, by decision of the President or Secretary of State.  There was never any guarantee that additional suspensions of the private right of action would be granted indefinitely into the future, and the operative provisions of the Act have remained in effect continuously since 1996.

49.     On April 17, 2019, Secretary of State Pompeo announced that the Trump Administration would no longer suspend the right to bring an action under Title III, effective May 2, 2019.  On May 2, 2019, upon the expiration of the last suspension, the right to bring an action under Title III was activated.

## II.        The Helms-Burton Act's Private Right of Action

50.        Title III of the Helms-Burton Act provides the following private right of action:

(1) Liability for trafficking. — (A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages...

22 U.S.C. § 6082(a)(1).

51.        The Act defines "person" as "any person or entity, including any agency or instrumentality of a foreign state." 22 U.S.C. § 6023(11).

52.        The Act defines "United States national" to include "any United States citizen[.]" 22 U.S.C. § 6023(15).

53.        A person "traffics" in confiscated property if that person "knowingly and intentionally":

(i)        sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii)        engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii)        causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property

without the authorization of any United States national who holds a claim to the property

22 U.S.C. § 6023(13).

54.        The Act defines "property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any

14

present, future, or contingent right, security, or other interest therein, including any leasehold

interest." 22 U.S.C. § 6023(12).

55.　　The Act defines "confiscated" in relevant part as:

> [T]he nationalization, expropriation, or other seizure by the Cuban
> Government of ownership or control of property, on or after January 1, 1959
> —
>
> (i)　　without the property having been returned or adequate and effective
> compensation provided; or
>
> (ii)　　without the claim to the property having been settled pursuant to an
> international claims settlement agreement or other mutually
> accepted settlement procedure.

22 U.S.C. § 6023(4)(A).

56.　　The Act defines "confiscated" in relevant part as "the nationalization,

expropriation, or other seizure by the Cuban Government of ownership or control of property, on

or after January 1, 1959 — (i) without the property having been returned or adequate and effective

compensation provided; or (ii) without the claim to the property having been settled pursuant to

an international claims settlement agreement or other mutually accepted settlement procedure."

22 U.S.C. § 6023(4)(A).

57.　　The term "knowingly" under the Act means "with knowledge or having reason to

know."　22 U.S.C. § 6023(9).

58.　　The Helms-Burton Act adopts the definition of "commercial activity" under 28

U.S.C. § 1603(d), *see* 22 U.S.C. § 6023(3), which defines the term as "either a regular course of

commercial conduct or a particular commercial transaction or act. The commercial character of an

activity shall be determined by reference to the nature of the course of conduct or particular

transaction or act, rather than by reference to its purpose."　28 U.S.C. § 1603(d).

59.     Since August 1, 1996, when the Helms-Burton Act went into effect, it has been clear that companies doing business with Cuba or in Cuba incurred potential liability under the Helms-Burton Act if they knowingly and intentionally traffic in confiscated property.

60.     Companies doing business in and/or with Cuba have therefore been on notice since August 1, 1996 that they would face potential liability under the Helms-Burton Act for trafficking in confiscated property.

### III.     Remedies Under the Helms-Burton Act's Private Right of Action

61.     A person who "traffics" in a U.S. national's confiscated property under the Helms-Burton Act is liable to a plaintiff for money damages equal to:

(i)     the amount which is the greater of —
                          …
        (II) the amount determined [by a court-appointed special master], plus interest; or

        (III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater[.]

22 U.S.C. § 6082(a)(1)(A)(i).

62.     Interest under the Act accrues from "the date of confiscation of the property involved to the date on which the action is brought."  22 U.S.C. § 6082(a)(1)(B).  Interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System" for the calendar week preceding the date of confiscation and compounded annually. 28 U.S.C. § 1961(a) (incorporated by reference in 22 U.S.C. § 6082(a)(1)(B)).

63.     A person who "traffics" in a U.S. national's confiscated property under the Act is also liable for plaintiffs' court costs and reasonable attorneys' fees.   *See* 22 U.S.C. § 6082(a)(1)(A)(ii).

64.     The Act provides for "Increased Liability"

… If the claimant in an action under this subsection… provides, after the end of the 3-month period described in paragraph (1) notice to —

(i)      a person against whom the action is to be initiated, or

(ii)     a person who is to be joined as a defendant in the action,

at least 30 days before initiating the action or joining such person as a defendant, as the case may be, and that person, after the end of the 30-day period beginning on the date the notice is provided, traffics in the confiscated property that is the subject of the action, then that person shall be liable to that claimant for damages computed in accordance with subparagraph (C).

*See* 22 U.S.C. §§ 6082(a)(3)(B) and 22 U.S.C. 6082(a)(3)(C)(ii) (allowing damages "3 times the amount determined applicable under paragraph (1)(A)).

## FACTUAL ALLEGATIONS

65.     Plaintiffs incorporate by reference Paragraphs 1 through 64 as if fully set forth herein.

### I.      The Confiscated Property

66.     Plaintiffs are U.S. nationals as defined by 22 U.S.C. § 6023(15)(A), who own claims to the Confiscated Property, which include a 70-year Concession to develop docks, warehouses and port facilities on Mariel Bay.

### A.      Maritima Mariel SA and the 70-Year Concession

67.     Maritima Mariel SA ("Maritima Mariel") was a Cuban corporation set up in 1954 and owned in equal parts by the Blanco Rosell Siblings, who are among the Plaintiffs in this case: Odette Blanco Rosell; the Estate of Alfredo Blanco Rosell, Jr; the Estate of Byron Blanco Rosell; the Estate of Enrique Blanco Rosell; and the Estate of Florentino Blanco Rosell.

68.     On August 15, 1955, the Cuban Government granted to Maritima Mariel a 70-year Concession:

'Maritima Mariel, SA' is hereby granted the concession to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel Bay, province of Pinar del Rio Province, and the construction of new buildings and works, without prejudice to the rights acquired by third persons or entities under previous concessions still in force, for the purposes stated in this paragraph.

Decree 2367 published in the Cuban Official Gazette dated August 15, 1955 at 13864 (English translation).

69.     The 70-Year Concession also authorized Maritima Mariel to exercise a series of exceptional rights in the Bay of Mariel, including:

a)   The occupation and use, either temporary or permanent, of the lands and waters in the public domain or under private ownership and those of the State, province, or municipality, whenever they are essential for the execution and exploitation of the aforementioned projects and works.

b)   The right of mandatory expropriation, in accordance with Decree No. 595 of May 22, 1907 or any other later provision regarding ownership, possession, or use of any real estate or private property rights for land that must be occupied for the work, uses, and services mentioned in Section One, a procedure that may also be used with regard to any rights granted by the State, province, or municipality with regard to the maritime-land zone or public domain land or property of those entities of the Nation.

c)   The right to impose, on privately owned property, any class of easement for the construction of any type of roads, traffic, access, movement, and parking of vehicles, the establishment of power lines (either overhead or underground), pipes and ducts for water, gas, ventilation, or drainage, and, in general, for anything that is inherent or deemed to be necessary for the purposes of carrying out, maintaining, and exploiting the works that the aforementioned paragraph one deals with, also with the power to attend those cases of forced expropriation, as provided for in the preceding subparagraph.

d)   The right to evict any tenants, sharecropper, squatter, or occupant of any other description from any property or facilities that must be occupied, either temporarily or permanently, for the projects referred to repeatedly in Section One, making a payment as compensation to the parties evicted equal to the amount of one year of rent paid in each case.

e)   The right to carry out the aforementioned acts by means of applying the provisions contained in Law-Decree No. 1015 of August 7, 1953 and No. 1998 of January 27, 1955, whereby the National Finance Agency of Cuba will provide the financing of those projects.

*Id.* at 13865-13866 (English translation).

70.     Both Maritima Mariel and the 70-Year Concession are part of the Confiscated Property and were specifically identified in Resolution 436 as being confiscated from the Blanco Rosell Siblings by the Cuban Government.

### B.     Central San Ramón, Compañia Azucarera Mariel S.A., and Land

71.     In addition to the 70-Year Concession and Maritima Mariel, the Blanco Rosell Siblings owned several other companies, including the sugar mill then known as the Central San Ramón, which they purchased in 1949.  Central San Ramón was owned and operated by Compañia Azucarera Mariel S.A. ("Azucarera Mariel"), a company wholly owned by the Blanco Rosell Siblings.

72.     The Blanco Rosell Siblings also had extensive land holdings (approximately 11,000 acres) southeast, south and west of Mariel Bay which they owned through Central San Ramón and Azucarera Mariel.  Those approximately 11,000 acres included numerous improvements such as roads, railways, buildings, and utilities.

73.     Azucarera Mariel, Central San Ramón and the 11,000 acres of land are part of the Confiscated Property that were specifically named in, and confiscated from the Blanco Rosell Siblings by the Cuban Government, in Resolution 436.

### II.     Cuba's Confiscation Of The Confiscated Property

74.     On September 29, 1960, per Resolution 436, the Cuban Government announced the confiscation without compensation of all assets and rights, whatever their nature, then owned by the Blanco Rosell Siblings and which are herein defined as the Confiscated Property.  Such Confiscated Property includes, *inter alia*, Maritima Mariel, the 70-year Concession, Central San

Ramón, Azucarera Mariel, as well as all the "all shares or stock certificates representing capital of the entities listed in the [other] Whereas of [Resolution 436]," which included, *inter alia*, the 70-Year Concession and all the lands owned by these entities.  *See* Resolution 436 at 23406.

75.      More specifically, on September 29, 1960, the Cuban Government published Resolution 436 in its Official Gazette on the confiscation without compensation of the following:

> One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.
>
> Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.
>
> Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).
>
> Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

Resolution No. 436(1) published in the Cuban Official Gazette dated September 29, 1960 at 23406 (English translation).

76.      In addition to expressly naming the 70-Year Concession and the above-referenced legal entities, Resolution 436 also expressly named the five Blanco Rosell Siblings as owners of, *inter alia*, the 70-Year Concession, Maritima Mariel, Central San Ramon, and Compania Azucarera Mariel.

77.      But for Cuba's confiscation in Resolution 436 published in the official Cuban Gazette on September 29, 1960, the 70-year Concession granted in Decree 2367 issued in 1955 would still be in force.  In any event, the Blanco Rosell Siblings' interests in the 70-year Concession were cut short by Cuba's confiscation of the 70-year Concession.

78.     According to the Cuban Official Gazette as published on September 29, 1960, the confiscation of the Confiscated Property occurred on August 19, 1960. The story of the confiscation by the Cuban Government was reported by the Revolucion newspaper on September 8, 1960.  Both the Cuban Official Gazette and the newspaper Revolucion (now known as Granma following the merger of the Revolucion and Hoy newspapers) are available to the public.

79.     The fact of the confiscation of the Blanco Rosell Siblings' property in Cuba was so well known that, on April 18, 2019, the day after the Trump Administration announced that it would allow Helms-Burton Act lawsuits under Title III to go forward, stories published on both Radio Marti and TV Marti identified Plaintiffs' claims to the Mariel Special Development Zone:

> The Mariel Special Development Zone, the star Cuban project to attract investment, was built on nationalized land where the Carranza-Bernal, Carbonell-González and Blanco-Rosell families owned sugar and hemp processing plants.[3]

80.     The Confiscated Property has never been returned nor has adequate and effective compensation ever been provided, including for the 70-Year Concession or any other property interests belonging to Plaintiffs.  Nor have the claims to the Confiscated Property been settled pursuant to an international claims settlement agreement or other settlement procedure.

81.     Plaintiffs never abandoned their interest in and claims to the Confiscated Property.

**IV.     The Cuban Government Incorporated The Confiscated Property Into The Zona Especial De Desarollo Mariel ("ZEDM") (a/k/a Mariel Special Economic Zone)**

82.     The Zona Especial de Desarollo Mariel ("ZEDM") (*a/k/a* Mariel Special Economic Zone) is an agency or instrumentality of the Cuban Government.   Created by statute, the ZEDM is a special economic zone in Cuba with its own legal structure.

---

[3]   https://www.radiotelevisionmarti.com/a/propiedades-que-ya-podr%C3%ADan-reclamar-en-tribunales-de-eeuu/236777.html/ (last visited February 2, 2021).

83.     As stated above, the ZEDM has been referred to in the media as "the star Cuban project to attract investment."  *See supra,* ¶ 79.

84.     Cuba incorporated the Confiscated Property into the ZEDM without the authorization of Plaintiffs and therefore the ZEDM traffics in the Confiscated Property.

85.     Starting in or around 2009, the Government of Cuba and various non-Cuban corporate partners rebuilt the Port of Mariel and constructed a container terminal in the ZEDM.

86.     The ZEDM's container terminal subsumes the Blanco Rosell Siblings' 70-Year Concession rights, pursuant to which they possessed the right, among other things, "to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel, province of Pinar del Rio, and the construction of new buildings and works…"  *See* Decree 2367 at 13865.

87.     The Blanco Rosell Siblings' extensive land holdings on the southeast, south and west sides of Mariel Bay, all of which are part of the Confiscated Property, cover virtually every square meter of ZEDM section A5, which the ZEDM operates as a logistics zone.

88.     The Blanco Rosell Siblings' 70-Year Concession encompasses all of Mariel Bay, including, but not limited to, ZEDM section A7, where the ZEDM's container terminal is located. The following map illustrates that ZEDM section A7 encompasses the shoreline of Mariel Bay and land adjacent to the shoreline, areas that are subject to the Blanco Rosell Siblings' 70-Year Concession:



89.    The ZEDM is trafficking in the Blanco Rosell Siblings' Confiscated Property

within the meaning of the Helms-Burton Act because the ZEDM:

> (i)    … transfers, distributes, dispenses, brokers, manages, or … leases, receives possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in [the Confiscated Property];

> (ii)    engages in a commercial activity using or otherwise benefitting from [the Confiscated Property];

> (iii)    causes, directs, participates in, or profits from trafficking (as described clause (i) or (ii) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii) through another person

without the authorization of any United States national who holds a claim to the property.

22 U.S. Code § 6023(13)(A).

90.    Those who "plan, study, execute, maintain and exploit public docks and

warehouses in Mariel Bay, Pinar del Rio Province, and the construction of new buildings and

works" (Decree 2367 at 13865) are trafficking in Plaintiffs' Confiscated Property, including Plaintiffs' 70-Year Concession.

## IV.   Defendant's Trafficking

91.     Since at least May 9, 2019, Defendant Seaboard Marine has trafficked in the Confiscated Property, by knowingly and intentionally directing the Trafficking Vessels from the Port of New Orleans to the Port of Mariel in Cuba, either directly or by causing, directing, participating in, or profiting from trafficking by or through one or more other persons.  When at the Port of Mariel, the Trafficking Vessels call at and/or otherwise use, benefit, and profit from the container terminal in the ZEDM, including the ZEDM's ports, docks, warehouses, and facilities.  Defendant also engages in commercial activities using or otherwise benefitting from the ZEDM and Plaintiffs' Confiscated Property.

92.     According to the International Maritime Organization ("IMO"), a specialized agency of the United Nations responsible for regulating shipping, Defendant operates the Trafficking Vessels, which have called at the Port of Mariel approximately twenty-four times since May 9, 2019, including the following:

| IMO No. | Arrival Date | Ship Name | Operator |
| --- | --- | --- | --- |
| 9374454 | May 9, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9294525 | Jun. 3, 2019 | AS PATRIA | Seaboard Marine Ltd |
| 9374454 | Jun. 18, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9294525 | Jun. 24, 2019 | AS PATRIA | Seaboard Marine Ltd |
| 9241475 | Jul. 2, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Jul. 23, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9294525 | Aug. 5, 2019 | AS PATRIA | Seaboard Marine Ltd |
| 9241475 | Aug. 13, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Aug. 20, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Sep. 3, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Sep. 9, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Nov. 25, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Dec. 18, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Apr. 15, 2019 | AS PETULIA | Seaboard Marine Ltd |

| 9241475 | Jul. 7, 2020 | NORDBALTIC | Seaboard Marine Ltd |
|---|---|---|---|
| 9395563 | Jul. 23, 2020 | SEABOARD ATLANTIC | Seaboard Marine Ltd |
| 9374454 | Jul. 30, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9374454 | Sep. 8, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9374454 | Oct. 22, 2020 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Oct. 29, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Nov. 21, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Dec. 13, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Jan. 21, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Jan. 21, 2021 | NORDBALTIC | Seaboard Marine Ltd |

93.     Non-Party Seaboard Corp. is the beneficial owner of the trafficking vessel SEABOARD ATLANTIC.

94.     In addition to the Trafficking Vessels, which are known (according to the IMO) to have called at the Port of Mariel, upon knowledge information and belief, the vessel AS PETRA (IMO 9283708), which has been chartered out to Defendant Seaboard Marine since September 2019, upon knowledge, information and belief, called at the Port of Mariel on January 7, 2020, January 31, 2020, May 19, 2020, and August 12, 2020.

95.     The Trafficking Vessels were knowingly and intentionally directed by Defendant Seaboard Marine to the Port of Mariel, where for themselves, and on behalf of and/or at the direction of Defendant Seaboard Marine, they engaged in commercial activity using or otherwise benefiting from the Confiscated Property, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).

96.     In addition, while at the Port of Mariel, the Trafficking Vessels engaged in commercial activities, whereby Defendant Seaboard Marine and non-party Seaboard Corp., caused, directed, participated in, or profited from trafficking by another person, or otherwise engaged in trafficking through another person without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

97.     Officers and/or Directors of non-party Seaboard Corp. know that Defendant Seaboard Marine does business with the ZEDM and in the ZEDM.

98.     In September 2020, Plaintiffs, through counsel, sent Defendant Seaboard Marine and non-party Seaboard Corp. notice letters pursuant to 22 U.S.C. § 6082(a)(3)(D) ("Notice Letters") notifying Defendant and non-party Seaboard Corp. that each are trafficking in confiscated property as defined in the Helms-Burton Act, the claims to which are owned by Plaintiffs, without the authorization of Plaintiffs. The table below shows the dates that Defendant and non-party Seaboard Corp. received these letters by various methods including Certified Mail, FedEx and Messenger.

| Recipient | Certified Mail Received | FedEx Received | Messenger Delivery |
|---|---|---|---|
| Defendant | 9/26/20 | 9/21/20 | 9/28/20 |
| Seaboard Corp. | 9/23/20 | 9/21/20 | 9/28/20 |

99.     Neither Defendant Seaboard Marine nor non-party Seaboard Corp. has responded to Plaintiffs' Notice Letters.  Likewise, they have not sought to obtain Plaintiffs' authorization to traffic in the Confiscated Property.

100.     Even after Defendant Seaboard Marine and non-party Seaboard Corp. received Plaintiffs' Notice Letters, giving them actual notice of Plaintiffs' claims, Defendant Seaboard Marine and non-party Seaboard Corp. continued to traffic in the Confiscated Property, the claims to which are owned by Plaintiffs, including at least three trafficking voyages that were undertaken by the NORDBALTIC more than 30 days after Defendant Seaboard Marine and non-party Seaboard Corp. received Plaintiffs' Notice Letters in September 2020:

| IMO No. | Arrival Date | Ship Name | Operator |
|---|---|---|---|
| 9241475 | Nov. 21, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Dec. 13, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Jan. 21, 2021 | NORDBALTIC | Seaboard Marine Ltd |

101.    Because neither Defendant Seaboard Marine nor non-party Seaboard Corp. obtained the authorization of Plaintiffs with regard to these acts of trafficking, Plaintiffs were injured by Defendant Seaboard Marine's and non-party Seaboard Corp.'s acts of trafficking in the Confiscated Property to which Plaintiffs own claims.

102.    Plaintiffs have been injured by Defendant Seaboard Marine and non-party Seaboard Corp.'s unauthorized acts of trafficking in the confiscated property to which Plaintiffs own claims because, *inter alia*:

(a)    Defendant Seaboard Marine and non-party Seaboard Corp. are profiting without obtaining consent from or paying adequate compensation to Plaintiffs;

(b)    Plaintiffs are not receiving the benefit of their interests in the Confiscated Property;

(c)    Defendant Seaboard Marine and non-party Seaboard Corp. are profiting without obtaining authorization or paying adequate compensation to Plaintiffs for authorization to traffic in the confiscated property;

(d)    Defendant Seaboard Marine and non-party Seaboard Corp. are profiting or otherwise benefiting from trafficking in the Confiscated Property by or through others without obtaining authorization from, or paying adequate compensation to, Plaintiffs;

(e)    Defendant Seaboard Marine's and non-party Seaboard Corp.'s  trafficking in the Confiscated Property has undermined Plaintiffs' rights to compensation for the Confiscated Property;

(f)      Defendant Seaboard Marine and non-party Seaboard Corp. have profited from their use of the Confiscated Property at Plaintiffs' expense;

(g)      Defendant Seaboard Marine and non-party Seaboard Corp. have denied Plaintiffs the ability to obtain economic rent that could have been negotiated for in exchange for their authorization to Defendant and Seaboard Corp. to traffic in the Confiscated Property; and

(h)      Defendant Seaboard Marine and non-party Seaboard Corp. have appropriated from Plaintiffs the leverage from the Helms-Burton Act that Plaintiffs would have had on the Cuban Government to negotiate compensation for their Confiscated Property.

103.   To the extent that Defendant Seaboard Marine or non-party Seaboard Corp. may claim to have one or more licenses issued by the United States Department of the Treasury Office of Foreign Assets Control for some or all of their shipments to Cuba, any such licenses do not qualify Defendant Seaboard Marine or non-party Seaboard Corp. to benefit from the lawful travel affirmative defense contained in 22 U.S.C. § 6023(13)(B)(iii).

**CLAIM FOR DAMAGES**
**TITLE III OF THE HELMS-BURTON ACT**

104.   Plaintiffs incorporate by reference paragraphs 1 through 103 as if fully stated herein.

105.   This case is brought pursuant to Title III of the Helms-Burton Act, 22 U.S.C. § 6082.

106.   Defendant did traffic, as the term "traffic" is defined in 22 U.S.C. § 6023(13)(A), in the Confiscated Property without authorization of Plaintiffs who own claims to the Confiscated Property.  Defendant is therefore liable to Plaintiffs under the Helms-Burton Act.

107.    Defendant has trafficked in the Confiscated Property, by knowingly and intentionally directing the Trafficking Vessels from the Port of New Orleans to the Port of Mariel in Cuba, either directly or by causing, directing, participating in, or profiting from trafficking by or through another person, including but not limited to non-party Seaboard Corp.  When in the Port of Mariel, the Trafficking Vessels call at, and/or otherwise use, benefit, and profit from the container terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and facilities. Defendant also engages in commercial activities using or otherwise benefitting from the ZEDM and Plaintiffs' Confiscated Property.

108.    Defendant is therefore trafficking in Plaintiffs' Confiscated Property and benefits or profits from the trafficking of the ZEDM in Plaintiffs' Confiscated Property.

109.    Defendant also knowingly and intentionally participated in, benefitted from, and profited from the ZEDM's trafficking in the Confiscated Property including, but not limited to, the 70-Year Concession, without the authorization of Plaintiffs.

110.    Defendant engages in a commercial activity using or otherwise benefitting from the Confiscated Property, including, but not limited to, the 70-Year Concession.

111.    Defendant also causes, directs, participates in, or profits from trafficking by the ZEDM in the Confiscated Property, including the 70-Year Concession.

112.    Defendant has had actual knowledge of Plaintiffs' claims to the Confiscated Property since at least September 21, 2020, due to Plaintiffs' Notice Letter mentioned above in Paragraph 93.

113.    Prior to Defendant's receipt of Plaintiffs' Notice Letter, Defendant knew or had reason to know that Plaintiffs own claims to the Confiscated Property.

114.    Prior to Defendant's receipt of Plaintiffs' Notice Letter, Defendant knew or had reason to know that the ZEDM was trafficking in the Confiscated Property.

115.    Defendant's continued trafficking in the Confiscated Property, including in the 70-Year Concession, more than 30 days after its receipt of Plaintiffs' Notice Letter, subjects Defendant to treble damages.  22 U.S.C. § 6082(a)(3).

116.    The ZEDM never sought nor obtained Plaintiffs' authorization to traffic in the Confiscated Property, including the 70-Year Concession, the land, or any other Confiscated Property at any time.

117.    The ZEDM's knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking without authorization as defined in 22 U.S.C. § 6023(13).

118.    Defendant did not seek nor obtain Plaintiffs' authorization to traffic in the Confiscated Property, including in the 70-Year Concession or any other property interests at any time.

119.    Defendant's knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking without authorization as defined in 22 U.S.C. § 6023(13).

120.    As a result of Defendant's trafficking in the Confiscated Property, Defendant is liable to Plaintiffs for all money damages allowable under 22 U.S.C. § 6082(a) including, but not limited to, those equal to:

a.    The amount which is the greater of: … (i) the amount determined by a special master pursuant to 22 U.S.C. § 6083(a)(2); or (ii) the "fair market value" of the Confiscated Property, plus interest;

b.    Three times the amount determined above (treble damages); and

c.    Court costs and reasonable attorneys' fees, and expenses.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demands judgment against Defendant as follows:

A.      Awarding damages as allowed by law including treble damages and pre-filing interest as provided by the Act;

B.      Awarding  prejudgment interest as allowed by law on any amounts awarded;

C.      Awarding attorneys' fees, costs, and expenses; and

D.      Awarding such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable, and a trial pursuant to Rule 39(c), Federal Rules of Civil Procedure, as to all matters not triable as of right by a jury.

Dated:  February 16, 2021                    Respectfully submitted,


HORR, NOVAK & SKIPP, P.A.

By:_____/s/ *David J. Horr*_____
        David J. Horr
        Florida Bar. No. 310761
        William R. Boeringer
        Florida Bar No. 347191
        William B. Milliken
        Florida Bar No. 143193
        Two Datran Center, Suite 1700
        9130 S. Dadeland Boulevard
        Miami, Florida 33156
        Telephone: (305) 670-2525
        Facsimile: (305) 670-2526
        dhorr@admiral-law.com
        wboeringer@admiral-law.com
        wmilliken@admiral-law.com


By:____/s/ *John S. Gaebe*_____
        John S. Gaebe
        Florida Bar No. 304824
        Law Offices of John S. Gaebe P.A.

5870 SW 96 St.
Miami, Florida  33156
johngaebe@gaebelaw.com

*Counsel for Plaintiff*

Of Counsel

BERLINER CORCORAN & ROWE LLP

David A. Baron (admitted *pro hac vice*)
Melvin White (admitted *pro hac vice*)
Laina C. Lopez (admitted *pro hac vice*)
1101 17th Street, N.W., Suite 1100
Washington, D.C. 20036-4798
Tel:  (202) 293-5555
Facsimile:  (202) 293-9035
dbaron@bcr-dc.com
mwhite@bcr-dc.com
lcl@bcr-dc.com

FIELDS PLLC

Richard W. Fields (admitted *pro hac vice*)
Martin Cunniff (to be admitted *pro hac vice*)
1701 Pennsylvania Ave, N.W., Suite 200
Washington, D.C. 20006
Tel:  (833) 382-9816
fields@fieldslawpllc.com
MartinCunniff@fieldslawpllc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of February, 2021, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/ David J. Horr*