UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-cv-25176-BLOOM/Otazo-Reyes

ODETTE BLANCO DE FERNANDEZ,
*née* Blanco Rosell, *et al.*,

      Plaintiffs,

v.

SEABOARD MARINE, LTD.,

      Defendant.
_____/

## ORDER ON MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendant Seaboard Marine Ltd.'s ("Defendant") Motion to Dismiss Plaintiffs' Amended Complaint, ECF No. [52] ("Motion"). Plaintiffs[1] filed an Opposition to Defendant's Motion to Dismiss, ECF No. [57] ("Response"), to which Defendant filed a Reply, ECF No. [63] ("Reply"). The Court has carefully reviewed the Motion, all opposing and supporting materials, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is granted in part and denied in part.

**I.    BACKGROUND**

    **a.  The LIBERTAD Act**

Since Fidel Castro seized power in Cuba in 1959, Cuba has been plagued by "communist tyranny and economic mismanagement," that has substantially deteriorated the welfare and health of the Cuban people. *See* 22 U.S.C. §§ 6021(1)(A), (2). The communist Cuban Government has

---

[1] There are eighteen Plaintiffs in this action, including Odette Blanco de Fernandez ("Ms. Fernandez"), the estates of her four deceased siblings Alfredo Blanco Rosell, Byron Blanco Rosell, Enrique Blanco Rosell, and Florentine Blanco Rosell ("Estates"), and the descendants of the Blanco Rosell Siblings ("Inheritors") (collectively, "Plaintiffs"). *See* ECF No. [45] ¶¶ 16-33.

systematically repressed the Cuban people through, among other things, "massive and systemic violations of human rights" and deprivations of fundamental freedoms, *see id.* §§ 6021(4), (24), and the United States has consistently sought to impose effective international sanctions for those violations against the Castro regime, *see id.* §§ 6021(8)-(10).

In 1996, Congress passed Title III of the Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C. § 6021, *et seq.* (the "LIBERTAD Act," "Title III," or the "Act"), commonly referred to as the Helms-Burton Act, "to strengthen international sanctions against the Castro government" and, relevant to the instant case, "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." 22 U.S.C. §§ 6022(2), (6). Under Title III of the Act, Congress denounced the Cuban Government's history of confiscating property of Cuban citizens and U.S. nationals, explaining that "[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development." 22 U.S.C. §§ 6081(2)-(3). The Act explains that foreign investors who traffic in confiscated properties through the purchase of equity interests in, management of, or entry into joint ventures with the Cuban Government to use such properties "complicate any attempt to return [these expropriated properties] to their original owners." *Id.* §§ 6081(5), (7). The LIBERTAD Act cautions that:

> [t]his "trafficking" in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise, to the current Cuban Government and thus undermines the foreign policy of the United States—
>
> (A) to bring democratic institutions to Cuba through the pressure of a general economic embargo at a time when the Castro regime has proven to be vulnerable to international economic pressure; and

> (B) to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government.

*Id.* §§ 6081(6)(A)-(B).

Further, the lack of effective international remedies for the wrongful confiscation of property and for unjust enrichment from the use of that property by foreign governments at the expense of the rightful owners left U.S. citizens without protection against wrongful confiscations by foreign nations and their citizens. *Id.* § 6081(10). Congress therefore concluded that, "[t]o deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." *Id.* § 6081(11); *see also* 22 U.S.C. § 6082(a)(1)(A). As a result, in passing Title III of the LIBERTAD Act, "Congress created a private right of action against any person who 'traffics' in confiscated Cuban property." *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1284 (S.D. Fla. 2019) (citing 22 U.S.C. § 6082(a)(1)(A); 22 U.S.C. § 6023(13)(A)).

> Shortly after Helms-Burton was passed, however, the President invoked Title III's [suspension] provision, and "Title III has since been waived every six months, . . . and has never effectively been applied." *Odebrecht Const., Inc. v. Prasad*, 876 F. Supp. 2d 1305, 1312 (S.D. Fla. 2012). That changed on April 17, 2019, when the U.S. Department of State announced that the federal government "will no longer suspend Title III." *See* U.S. Department of State, Secretary of State Michael R. Pompeo's Remarks to the Press (Apr. 17, 2019), https://www.state.gov/remarks-to-the-press-11/.

*Id.*; *see also* 22 U.S.C. § 6085(c) (presidential power to suspend the right to bring a cause of action under Title III). On May 2, 2019, the suspension of claimants' rights to bring actions under Title III was lifted, enabling suit to be filed against alleged traffickers.

### b. This Case

On December 20, 2020 Plaintiffs initiated this action against Defendant to recover damages under Title III of the LIBERTAD Act for Defendant's alleged trafficking in property that was

3

confiscated by the Cuban Government and to which Plaintiffs own claims. *See* ECF No. [1]. According to the Amended Complaint, ECF No. [45], the Blanco Rosell Siblings owned various corporations and assets in Cuba that were confiscated by the Cuban Government in 1960. *Id.* ¶¶ 4, 67-73. Specifically, the Blanco Rosell Siblings owned Maritima Mariel SA ("Maritima Mariel"), a Cuban corporation, to which the Cuban Government granted a 70-Year Concession to develop docks, warehouses, and port facilities in Mariel Bay, Cuba:

> 'Maritima Mariel, SA' is hereby granted the concession to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel Bay, province of Pinar del Rio Province, and the construction of new buildings and works, without prejudice to the rights acquired by third persons or entities under previous concessions still in force, for the purposes stated in this paragraph.

*Id.* ¶ 68 (quoting Cuban Official Gazette, Decree No. 2367, at 13864 (Aug. 15, 1955) (English Translation)). The 70-Year Concession further granted Maritima Mariel a series of "exceptional" rights to the Bay of Mariel, including "the right of mandatory expropriation[,]" and the right to impose "any class of easement" and "to evict any tenants . . . or other occupants[.]" *Id.* ¶ 69 (quoting Decree No. 2367, at 13865-66). The Blanco Rosell Siblings also owned other companies, including a sugar mill then known as Central San Ramón and Compañia Azucarera Mariel S.A. ("Azucarera Mariel"). *Id.* ¶¶ 71-72. Through Central San Ramón and Azucarera Mariel, the Blanco Rosell Siblings owned approximately 11,000 acres of land to the southeast, south, and west of Mariel Bay, which included improvements such as roads, railways, buildings, and utilities. *Id.* ¶¶ 71-73.

On September 29, 1960, the Cuban Government announced the confiscation without compensation of all assets owned by the Blanco Rosell Siblings, including: Maritima Mariel, Central San Ramón, Azucarera Mariel, along with their property, rights, and shares—i.e., the 70-

Year Concession and land owned by these entities ("Confiscated Property"). *Id.* ¶¶ 74-75 (quoting Cuban Official Gazette, Resolution No. 436, at 23406 (Sept. 29, 1960) (English Translation)). Following the Cuban Government's confiscation, the Blanco Rosell Siblings fled Cuba and became United States citizens before March 12, 1966. *Id.* ¶ 5.

According to the Amended Complaint, the confiscation was published in the Cuban Official Gazette and reported in the Revolucion newspaper, which are both available to the public. *Id.* ¶ 78. Plaintiffs also allege that "the confiscation of the [Confiscated Property] was so well known that, on April 18, 2019, the day after the Trump Administration announced that it would allow Helms-Burton Act lawsuits under Title III to go forward," stories were published on a Cuban television and radio program stating that the Mariel Special Development Zone, a "special economic zone" created by the Cuban Government at Mariel Bay ("ZEDM"), "was built on nationalized land where the Carranza-Bernal, Carbonell-González and Blanco-Rosell families owned sugar and hemp processing plants." *Id.* ¶ 79.

### i. Alleged Trafficking by the Zona Especial De Desarollo Mariel ("ZEDM" or "Mariel Special Economic Zone")

The ZEDM is an "agency or instrumentality of the Cuban Government" and operates as a "special economic zone" at Mariel Bay. *Id.* ¶ 82. Plaintiffs contend that the Cuban Government "incorporated the Confiscated Property in the ZEDM without authorization of Plaintiffs and therefore the ZEDM traffics in the Confiscated Property." *Id.* ¶ 84. Specifically, beginning in 2009, the Cuban Government rebuilt the Port of Mariel and constructed a container terminal in the ZEDM. *Id.* ¶ 85. Plaintiffs allege that the container terminal, located in ZEDM section A7, "subsumes the Blanco Rosell Siblings' 70-Year Concession rights, pursuant to which they possessed the right . . . 'to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel . . . and the construction of new buildings and works[.]'" *Id.* ¶ 86 (quoting

5

Decree No. 2367, at 13865). Plaintiffs further allege that their "extensive land holdings on the southeast, south and west sides of Mariel Bay . . . cover virtually every square meter of ZEDM section A5, which the ZEDM operates as a logistics zone." *Id.* ¶ 87.

### ii. Alleged Trafficking by Defendant

Defendant is an ocean transportation company that operates vessels between the United States and the Caribbean Basin. *Id.* ¶ 34. The Amended Complaint alleges that beginning on or about May 9, 2019, Defendant operated approximately twenty-four voyages where its vessels sailed from the Port of New Orleans to the Port of Mariel in Cuba. *Id.* ¶¶ 91-92. When at the Port of Mariel, Defendant's vessels purportedly "call at and/or otherwise use, benefit, and profit from the container terminal in the ZEDM, including the ZEDM's ports, docks, warehouses and facilities." *Id.* ¶ 91. Plaintiffs further contend that by using or otherwise benefiting from the ZEDM and Plaintiffs' Confiscated Property, Defendant "engag[ed] in commercial activities." *Id.*

Defendant now moves to dismiss the Amended Complaint, arguing that the Amended Complaint fails to plausibly allege that: (1) Defendant trafficked in the Confiscated Property; (2) Defendant "knowingly and intentionally" trafficked in the Confiscated Property; and (3) Plaintiffs, other than Ms. Fernandez, have an actionable ownership interest in the Confiscated Property. *See* ECF No. [52]. In their Response, Plaintiffs take the opposing position on each of Defendant's bases for dismissal. *See* ECF No. [57].

## II.   LEGAL STANDARD

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule

8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682).

A court, in considering a Rule 12(b)(6) motion, "may consider only the complaint itself and any documents referred to in the complaint which are central to the claims." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)); *see also Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity." (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002))).

## III.   DISCUSSION

As noted, Defendant argues that dismissal of the Amended Complaint is warranted because it fails to plausibly allege that: (1) Defendant trafficked in the Confiscated Property; (2) Defendant "knowingly and intentionally" trafficked in the Confiscated Property; and (3) Plaintiffs, other than Ms. Fernandez, have an actionable ownership interest in the Confiscated Property. *See* ECF No. [52]. The Court addresses each argument in turn.

### a.   Trafficking in Confiscated Property

Defendant contends that the Amended Complaint fails to plausibly allege that Defendant trafficked in property confiscated by the Cuban Government and to which Plaintiffs own a claim. Under the LIBERTAD Act, "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property." 22 U.S.C. § 6082(a)(1)(A). The Act defines "traffics" as follows:

> a person "traffics" in confiscated property if that person knowingly and intentionally--
>
> (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
>
> (ii) engages in a commercial activity[2] using or otherwise benefiting from confiscated property, or
>
> (iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,
>
> without the authorization of any United States national who holds a claim to the property.

---

[2] Under the Title III, the term "commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d); 22 U.S.C. § 6023(3).

8

22 U.S.C. § 6023(13)(A) (footnote supplied). Thus, the definition of "traffics" relates to offending conduct in the broad concept of "confiscated property"—i.e., in any property that was nationalized, expropriated, or otherwise seized by the Cuban Government to obtain ownership or control, without the property having been returned or adequate and effective compensation—"without the authorization of any United States national who holds a claim to the property." *Id.* § 6023(13); *see also id.* § 6023(4).

### iii. Trafficking under 22 U.S.C. § 6023(13)(A)(ii)

Upon review, the Amended Complaint sufficiently alleges that Defendant engaged in "commercial activity using or otherwise benefited from" the Port of Mariel and the container terminal without Plaintiffs' authorization, thereby trafficking in Plaintiffs' Confiscated Property.[3] *See* 22 U.S.C. § 6023(13)(A)(ii); *see also* ECF No. [45] ¶¶ 10-14, 91-96. Specifically, the Amended Complaint alleges that the Cuban Government "incorporated the Confiscated Property into the ZEDM" where the newly constructed Port of Mariel and container terminal are located. ECF No. [45] ¶¶ 84-85, 88. The Amended Complaint then identifies twenty-four voyages during which vessels operated by Defendant sailed to the Port of Mariel and "call[ed] at and/or otherwise use[d], benefit[ed], and profit[ed] from the container terminal in the ZEDM, including the ZEDM's ports, docks, warehouses, and facilities." *Id.* ¶¶ 91-92 (identifying each voyage by IMO number, arrival date, ship name, and operator); *see also id.* ¶¶ 95-96. Lastly, the Amended Complaint alleges that Defendant's commercial activities in the Confiscated Property were conducted without Plaintiffs' authorization. *Id.* ¶¶ 99, 101-02.

---

[3] Contrary to Defendant's contention, Plaintiffs need not set forth specific facts indicating the precise square footage within which Defendant trafficked. ECF No. [52] at 15. At the motion to dismiss stage, Plaintiffs' allegations that the Cuban Government incorporated the Confiscated Property into the ZEDM is sufficient. ECF No. [45] ¶¶ 84-88. Ultimately, any recovery Plaintiffs may obtain in this case will be commensurate with the value of Confiscated Property actually trafficked in.

Defendant maintains that Plaintiffs' allegation regarding trafficking must fail because it "merely tracks the statutory definition[.]" ECF No. [52] at 14 (citing 22 U.S.C. § 6023(13)(A)(ii)). The Court is not persuaded. Indeed, while the term "call" is admittedly undefined in the Amended Complaint, Plaintiffs explain that a "port of call" in the shipping industry is defined as: (1) "an intermediate port where ships customarily stop for supplies, repairs, or transshipment of cargo" or (2) "a stop included in an itinerary[.]" *See* Port of Call, *Merriam-Webster.com Dictionary*, available at https://www.merriam-webster.com/dictionary/port%20of%20call (last visited July 23, 2021). Accepting this definition as true, the Court can plausibly infer that Defendant engaged in "commercial activity" when its vessels called at the container terminal in the ZEDM. Thus, at this stage of the proceedings, Plaintiffs' allegations are more than sufficient to "give [Defendant] fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Defendant further contends that "the container terminal is not property to which Plaintiffs[] own a claim that could provide a basis for their Title III claims" because the Port of Mariel and its container terminal were constructed in March of 2009 and, therefore "decades after the Cuban Government confiscated the property in 1960." ECF No. [52] at 14. However, the Amended Complaint sufficiently sets forth that in constructing the Port of Mariel and its container terminal in ZEDM, the Cuban Government exploited the same rights that were granted to the Blanco Rosell Siblings in the 70-Year Concession. *See* ECF No. [45] ¶ 68 (granting, among other things, the right to "plan, develop, study, execute, maintain and exploit public docks and warehouses in the Bay of Mariel[.]"); *id.* ¶¶ 85-86, 88; *see also Iglesias v. Richard*, No. 20-cv-20157, 2020 U.S. Dist. LEXIS 164117, at *26 (S.D. Fla. Aug. 17, 2020) (rejecting defendant's argument that "the commercial

activity occurred with a different product and brand name nearly thirty years after the alleged illegal taking" was sufficient to defeat plaintiff's allegations of a trafficking).[4]

Moreover, the fact that Plaintiffs' concession rights to develop the Bay of Mariel were non-exclusive does not alter the Court's analysis. *See* ECF No. [45] ¶ 68 (stating that the 70-Year Concession was granted "without prejudice to the rights acquired by third persons or entities under previous concessions still in force[.]"). As Plaintiffs correctly highlight, there is no language in Title III that requires Plaintiffs to have an exclusive claim to the Confiscated Property. ECF No. [57] at 23. "[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Patel v. U.S. Att'y Gen.*, 917 F.3d 1319, 1326 n.5 (11th Cir. 2019) (quoting *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018)); *see also Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009) (In construing a statute, a court is "not allowed to add or subtract words from [the] statute."). Yet, notably absent from the definition of "traffics" is any limitation on the scope of trafficking to only a particular interest in confiscated property. *See* 22 U.S.C. § 6023(13)(A). Further contradicting any need to constrict the definition of "traffics" is the fact that it relates to offending conduct in the broad definition of "property"— "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security,

---

[4] Additionally, the Court is not convinced that Plaintiffs should somehow be precluded from asserting a Title III claim because the Cuban Government enhanced and/or changed the nature of the Confiscated Property following its illegal confiscation. Holding as such would certainly undermine Congress' stated goal of protecting the claims of United States nationals whose property was wrongfully confiscated by the Cuban Government. *See* 22 U.S.C. § 6022(6) (one reason for passing Title III was "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime.").

or other interest therein, including any leasehold interest." *Id.* § 6023(12)(A). Thus, the Court rejects Defendant's narrow interpretation of Title III.

Lastly, while the 70-Year Concession was granted "without prejudice to the rights acquired by third persons or entities under previous concessions still in force[,] *id.* ¶ 68, the Amended Complaint alleges that the 70-Year Concession "authorized Maritima Mariel to execute a series of exceptional rights in the Bay of Mariel" including the right of mandatory expropriation, the right to impose any class of easement, and the right to evict any occupants from the property. *Id.* ¶ 69 (citing Decree No. 2367, at 13865-66). Thus, accepting the allegations in the Amended Complaint as true, had the 70-Year Concession not been illegally confiscated, the Blanco Rosell Siblings' authorization would have been required for the ZEDM to exploit those rights.[5]

### iv. Trafficking under 22 U.S.C. § 6023(13)(A)(iii)

The Amended Complaint also plausibly alleges that Defendant trafficked in the Confiscated Property through the acts of the ZEDM. *See* 22 U.S.C. § 6023(13)(A)(iii); *see also* ECF No. [45] ¶¶ 82-90. Specifically, the Amended Complaint alleges that: (1) the ZEDM is "an agency or instrumentality of the Cuban Government[,]" *id.* ¶ 82; (2) "Cuba incorporated the Confiscated Property into the ZEDM[,]" *id.* ¶ 84; (3) the Cuban Government "rebuilt the Port of Mariel and constructed a container terminal in the ZEDM[,]" *id.* ¶ 85; (4) the "container terminal subsumes the Blanco Rosell Siblings' 70-Year Concession rights," which included the right "to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel," *id.* ¶ 86; and (5) "[t]he Blanco Rosell Siblings' extensive land holdings . . . which are part of the

---

[5] While Defendant appears to challenge Plaintiffs' ownership interest to the Confiscated Property, this argument necessarily involves factual determinations that go well beyond the four corners of the Amended Complaint. *See* ECF No. [63] at 11-12 (arguing that to the extent Maritima Mariel failed to begin enumerated work within 18 months from the date of the concession, any purported interest in the 70-Year Concession was forfeited). At this stage of the proceedings, the Court is satisfied that Plaintiffs have sufficiently pled an ownership interest in the Confiscated Property. *See* ECF No. [45] ¶¶ 4, 16-20, 67-77.

12

Confiscated Property, cover virtually every square meter of ZEDM section A5, which the ZEDM operates as logistics zone[,] *id.* ¶ 87. Thus, the Cuban Government, through the ZEDM, traffics in the Confiscated Property by exploiting the Blanco Rosell Siblings rights set forth in the 70-Year Concession, as well as their right to the land holdings on which the ZEDM sits. Conversely, because Defendant purportedly participates or otherwise profits from the ZEDM's trafficking by calling at the Port of Mariel and its container terminal, the Court can reasonably infer that Defendant has benefited from the ZEDM's trafficking in the Confiscated Property. Thus, the Amended Complaint plausibly alleges that Defendant participated in, and profited from, the Cuban Government's confiscation and possession of the Confiscated Property without Plaintiffs' authorization.

### b. Scienter: "Knowing and Intentionally"

Defendant next argues that the Amended Complaint lacks factual allegations that allow a plausible inference that Defendant "knowingly and intentionally" trafficked in the Confiscated Property. *See* ECF No. [52] at 12-15. In support of its position, Defendant highlights that, unlike other Title III cases before this Court, Plaintiffs' claims to the Confiscated Property were not certified by the Foreign Claim Settlement Commission ("FCSC"). Defendant further argues that Plaintiffs' "bare allegations that articles were published in Cuba and [that] Plaintiffs sent a [pre-suit] demand letter to [Defendant] do not and cannot support a plausible inference that Defendant" knowingly and intentionally trafficked in confiscated property. *Id.* at 2.

In addition to alleging that the Cuban Government's confiscation was published and available to the public well-before Defendant began trafficking in 2019, ECF No. [45] ¶¶ 2, 4, 68, 75, 78-79, the Amended Complaint further alleges that Defendant continued to traffic in the Confiscated Property both after it received Plaintiff's pre-suit notice letter and after it was served

13

with the initial Complaint. *See* ECF Nos. [1], [25], and [45] ¶¶ 92, 98-100 (alleging that on November 21, 2020, December 13, 2020, and January 21, 2021, Defendant operated the NODBALTIC, which arrived in the Bay of Mariel and called at the Port of Mariel). Accepting these facts as true and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that the Amended Complaint sufficiently sets forth Defendant's scienter, at the very least for the post-notice period. *See Glen v. Trip Advisor LLC*, No. 19-cv-1809-LPS, 2021 WL 1200577, at *10 (D. Del. Mar. 30, 2021) (finding that plaintiff plausibly alleged scienter against defendants who continued to traffic in the subject property more than thirty days after receiving plaintiff's pre-suit notice of claim). Accordingly, the Motion is denied on this basis.

### c. Plaintiffs' Actionable Ownership Interest

Lastly, Defendant seeks dismissal of the Inheritors and Heirs from this action, arguing that they do not have an actionable ownership interest in the Confiscated Property because they acquired their claims after March 12, 1996.[6] The relevant provision of the LIBERTAD Act provides: "In the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless *such* national acquires ownership of the claim before March 12, 1996." 22 U.S.C. § 6082(a)(4)(B) (emphasis added).

The unambiguous language of § 6082(a)(4)(B) instructs that a United States national cannot bring an action under Title III "unless such national" acquires an interest to the confiscated property before March 12, 1996. *Id.* The statutory language also makes clear that the United States national who acquired ownership of the claim must be the *same* United States national who brings the Title III action. *See Gonzalez v. Amazon.com, Inc.*, No. 19-23988-CIV, 2020 WL 2323032, at

---

[6] Defendant does not challenge Ms. Fernandez's ownership interest, which is otherwise sufficiently alleged. ECF No. [45] ¶ 16.

14

\*2 (S.D. Fla. May 11, 2020), *aff'd*, 835 F. App'x 1011 (11th Cir. 2021) ("The statute states that a United States national may not being an action 'unless *such* national' acquires an interest to the property before 1996." (citations omitted)); *Glen*, 2021 WL 1200577, at \*7 ("[T]he United States national who acquired the ownership of the claim must be the same United States national who brings the action, not the predecessor of the United States national who brings the action[.]" (citations omitted)).

The Court agrees that the Inheritors have not plausibly alleged that they acquired claims to the Confiscated Property before March 12, 1996. Indeed, because each of the deceased Blanco Rosell Siblings died after March 12, 1996, the Inheritors could not have acquired a claim to the Confiscated Property before the statutory cutoff. ECF No. [45] ¶¶ 17-20. In their Response, Plaintiffs effectively urge the Court to disregard the plain language of Title III, as well as the clear guidance from every court that has addressed this precise issue—including the Eleventh Circuit. *See Gonzalez v. Amazon.com, Inc.*, 835 F. App'x 1011, 1012 (11th Cir. 2021) (per curiam).[7] The Court declines to do so. Accordingly, because the Inheritors did not acquire their claims to the Confiscated Property until after the statutory cutoff, they cannot maintain an action under Title III.

Similarly, the Estates do not have an actionable ownership interest in the Confiscated Property and cannot maintain a Title III action on behalf of the deceased Blanco Rosell Siblings. The Eleventh Circuit has instructed that "[i]n the absence of an expression of *contrary intent*, the survival of a federal cause of action is a question of federal common law." *United States v. NEC*

---

[7] *See also Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, No. 20-cv-21630-, 2021 WL 1648222, at \*5 (S.D. Fla. Apr. 27, 2021); *Glen*, 2021 WL 1200577, at \*7; *Garcia-Bengochea v. Royal Caribbean Cruises, Ltd.*, No. 19-cv-23592-JLK, 2020 WL 6081658, at \*3 (S.D. Fla. Oct. 15, 2020); *Glen v. Am. Airlines, Inc.*, No. 20-cv-482-A, 2020 WL 4464665, at \*4 (N.D. Tex. Aug. 3, 2020); *Iglesias*, 2020 U.S. Dist. LEXIS 164117, at \*26; *Garcia-Bengochea v. Carnival Corp.*, No. 19-cv-21725-JLK, 2020 WL 4590825, at \*3 (S.D. Fla. July 9, 2020); *Del Valle v. Trivago GmbH*, No. 19-cv-22619, 2020 WL 2733729, at \*5 n.2 (S.D. Fla. May 26, 2020).

*Corp.*, 11 F.3d 136, 137 (11th Cir. 1993) (emphasis added) (citing *James v. Home Constr. Co. of Mobile*, 621 F.2d 727, 729 (5th Cir. 1980)). As stated above, the congressional intent is clear that those who acquired claims to confiscated property after the March 12, 1996 cutoff cannot assert a cause of action under Title III. *See* 22 U.S.C. § 6082(a)(4)(B).

While there is no dispute that the deceased Blanco Rosell Siblings acquired their claims to the Confiscated Property before March 12, 1996, ECF No. [45] ¶¶ 17-20, the Court disagrees that "the estates and personal representatives 'stepped into the shoes' of the decedents [and] maintain[ed] the original acquisition date of the Confiscated Property[.]" ECF No. [57] at 8. Indeed, it is well-settled that upon the death of the four Blanco Rosell Siblings, their assets became property of their respective estates and no longer belonged to them individually. *See Depriest v. Greeson*, 213 So. 3d 1022, 1025 (Fla. 1st DCA 2017); *Sharps v. Sharps*, 214 So. 2d 737, 738 (Fla. 4th DCA 1982) ("Upon [husband's] death, in the twinkling of a legal eye, that check became an asset of the husband's estate."); *see also* Fla. Stat. § 732.101(2) ("The decedent's death is the event that vests the heirs' right to the decedent's intestate property."); Fla. Stat. § 732.514 ("The death of the testator is the event that vests the right to devises unless the testator in the will has provided that some other event must happen before a devise vests."). Thus, because the ability to bring a Title III action is contingent upon acquiring a claim to confiscated property by a date certain, the Estates had to acquire their interest in the Confiscated Property before March 12, 1996, which they did not. Thus, the Estates cannot maintain a cause of action under Title III.

## IV.     CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Motion, **ECF No. [52]**, is **GRANTED IN PART AND DENIED IN PART**.

2. The following Plaintiffs are dismissed from this action: (1) Estate of Alfredo Blanco Rosell; (2) Estate of Byron Blanco Rosell; (3) Estate of Enrique Blanco Rosell; (4) Estate of Florentino Blanco Rosell; (5) Emma Ruth Blanco; (6) Liana Maria Blanco; (7) Susannah Valentina Blanco; (8) Hebe Blanco Miyares; (9) Lydia Blanco Bonafonte; (10) Jacqueline M. Delgado; (11) Byron Diaz Blanco, Jr.; (12) Magdelena Blanco Montoto; (13) Sergio Blanco; (14) Florentino Blanco de la Torre; (15) Joseph E. Bushman; (16) Carlos Blanco de la Torre; and (17) Guillermo Blanco De La Torre.

3. Defendant shall file an Answer to the Amended Complaint, ECF No. [45], **no later than August 10, 2021**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on July 27, 2021.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record