UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-cv-25176-BLOOM/Otazo-Reyes

ODETTE BLANCO DE FERNANDEZ *née*
BLANCO ROSELL,

    Plaintiff,

v.

SEABOARD MARINE, LTD.,

    Defendant.

_____/

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO STRIKE PLAINTIFF'S DEPOSITION ERRATA**

Plaintiff, through her undersigned counsel, files this Opposition to Defendant's Motion to Strike Plaintiff's Deposition Errata (ECF No. 155) and, in support, states:

**INTRODUCTION**

This case is about Seaboard Marine's ("Seaboard") trafficking in property that Cuba confiscated in 1960 from Ms. Fernandez and her now-deceased brothers, Alfredo, Jr., Florentino, Byron, and Enrique Blanco Rosell. That confiscated property includes a sugar mill and sugar cane fields referred to as "Central San Ramon," over 11,000 acres of land, including roads, railroads, utilities, and a Concession to develop docks, warehouses, and port facilities in the Bay of Mariel, Cuba. At her two depositions, Ms. Fernandez, who was then 91 years old (she is now 92 years old), could not recall the names of the corporate entities that held her family businesses 60 years ago (there were at least 18 entities), and so Ms. Fernandez and Seaboard's counsel referred to them throughout collectively as the "family business," or individually as "Central San Ramon," "sugar mill," "sugar cane fields," "Mariel Dock," or the "Concession." Ms. Fernandez testified

unequivocally and repeatedly – for nearly 7 hours – that she owned Central San Ramon, the land, the port, the dock, the sugar mill, the Concession, and all her family businesses equally with her four brothers and that she would receive annual dividends from the family businesses as a shareholder. Ignoring this testimony, Seaboard has now filed its ***fifth motion*** arguing that Ms. Fernandez testified that she did not own her family's businesses.[1] As shown below, Seaboard's arguments are wrong.

After Ms. Fernandez first learned that Seaboard twisted "I do not recall the names" into "She never owned her family's businesses," she timely and appropriately submitted an errata sheet changing answers like "I do not recall" to:

> I do not recall the names of all of the family businesses, but I do recall that I was an equal owner in the family businesses with my four brothers.

*See* Exh. A at 125:10. That change introduces nothing new. She had already testified she was an equal owner and received equal annual dividends from the family businesses. The errata sheet also supplied the exact percentage of her and her brothers' ownership interests (20% each) because she could not recall those numbers at the deposition. But that was nothing new either. She had already disclosed those in her interrogatory responses. Finally, she corrected a mistaken recollection that her father was one of the owners with her and her brothers. But Seaboard already

---

[1] First, Seaboard filed a motion to dismiss raising this issue. It was denied. Then Seaboard filed an expedited motion for continuance raising this issue. It was denied. Then Seaboard filed a second expedited motion for continuance raising this issue. It was denied. Then Seaboard filed a motion to strike the errata sheet with the Magistrate Judge raising this issue. It was denied in part and deferred in part to this Court. Now Seaboard has filed this motion to strike.

knew that was a mistake based on her interrogatory responses and, regardless, it doesn't contradict her testimony that she was one of the owners as well.

That is the extent of Ms. Fernandez's errata sheet. There is not a single new fact. She does not change a single "yes" to "no" or "no" to yes." Every change in the errata sheet is consistent with Ms. Fernandez's testimony under oath at her depositions and in her interrogatory responses, all of which is corroborated by documents and other evidence in this case. But, as shown below, that does not fit within the false narrative created by Seaboard that Ms. Fernandez never owned her family's businesses because she could not remember from over 60 years ago the names entities through which she owned the businesses. However, helping bolster a false narrative is not a legal basis to strike an errata sheet. The motion should be denied.

## BACKGROUND

### I.     Ms. Fernandez's Testimony

As the Cuban Government confirmed in Resolution 436 ("Confiscatory Decree") published September 29, 1960 in Cuba's Official Gazette: "[i]t has been proven that the properties of … [Ms. Fernandez and her brothers] included 'capital shares'" in 18 companies listed in the Confiscatory Decree. The Confiscatory Decree states that Cuba confiscated Ms. Fernandez's ownership interests in the 18 companies, as well as every other asset she owned except her "strictly personal" property and rights:

> One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.
>
> Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution,

along with all of their properties, rights, and shares that are issued and in circulation.

Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).

Exh. B at Plf.001099.

Throughout her two depositions, Ms. Fernandez testified that she could not recall the names of those companies, but that she was an equal owner in her family's businesses. During the depositions, Seaboard's counsel did not use the corporate names when discussing the family businesses, or Ms. Fernandez's ownership of them (which included, *i.a.,* 11,000 acres of land, roads, railways, utilities, a sugar mill, a dock, and the Concession), instead referring to them as the "business" or "Central San Ramon" or the "sugar mill" or the "Concession," the same names that Ms. Fernandez used to describe the family businesses. For example, Seaboard's counsel asked: "What percent of Central San Ramon did you own, supposedly, when you fled Cuba?" and similarly referred to them as "your family businesses." Exh. C, Dec. 17, 85:7-8; p. 157:22. The terms "business" and "Central San Ramon" are used ***over 100 times*** throughout her depositions. The actual corporate names were only used to establish she could not recall them.

Ms. Fernandez testified – unequivocally – that she owned the Central San Ramon family businesses and their assets and received annual dividends as a shareholder of the businesses:

> Q. And did you purchase these sugar fields in or around the sugar mill at Central San Ramon?
> A. Yes, sir.

Exh. C, Dec. 17, 83:20-22.

> Q. Did you own the Central San Ramon sugar mill, at the time you fled Cuba?
> A. Yes, sir.

Exh. C, Dec. 17, 84:13-15.

> Q. But all five siblings owned Central San Ramon?
> A. Yes. Yes.

Exh. C, Dec. 17, 86:08-09.

> Q. Did you own the Mariel dock before you left Cuba?
> A. Yes.

Exh. C, Dec. 17, 151:24-25.

> A. [T]he sugar mill was the working thing for the family . . . the family business.

Exh. C, Dec. 14, 26:22-27:02.

> Q. [A]fter purchasing Tapia, did Tapia become part of the family properties?
> A. Yes . . . it belongs to the family.

Exh. C, Dec. 14, 31:17-21.

Ms. Fernandez testified that "once a year there was a reunion, a family reunion" at the family business office in Havana where the family would review how the family businesses performed and the family members would receive their equal distribution of "[t]he dividends for what had been earned throughout the year." Exh. D, Dec. 14, 47-49. In particular, she testified:

> Q. You received $5,000 per year *from the business*?
> A. Uh-huh.

Exh. D, Dec. 14, 49:03-05 (emphasis added)).

Although at times she testified that her father was also a shareholder and that she couldn't recall the specific percentages of every family member's ownership (Exh. C, Dec. 17, 84-86), her interrogatory responses clarify the precise ownership structure of the family businesses:

> The Blanco Rosell Siblings each owned 20% of Azucarera Mariel S.A. Maritima Mariel was established as a subsidiary of Azucarera Mariel S.A. in 1954 and was equally owned (20% each) by the Blanco Rosell Siblings.
>
> The Blanco Rosell Siblings owned 100 per cent of Maritima Mariel from 1954 until 1960, when Cuba confiscated Azucarera Mariel, S.A., and all of its holdings including Maritima Mariel.

Exh. E at p. 5.[2] These details on corporate formalities from 62 years ago were not top of mind for the then 91-year-old Ms. Fernandez at her deposition, but she readily recalled numerous other details about her ownership of the Central San Ramon family business. For example, she testified at both depositions why she and her brothers owned the family business but her sister, Hebe, did not, explaining that her sister was a nun at a convent and so she did not share in the dividends at the annual family reunion. Exh. C, Dec. 17, 88-89; Exh. D, Dec. 14, p. 49:13-15.

Seaboard's counsel and Ms. Fernandez even spent time clarifying that, when they referred to property of "San Ramon," they were talking about the property of her family's business and although that business no longer exists, the property it owned still exists and Seaboard is using it:

> Q. Ms. Fernandez, this morning your attorney, Mr. White, he asked you why did you sue the company Seaboard Marine. And you said, "justice and compensation because they have been using our facilities for a long time."
> A. Yes.
> Q. "And that was stolen from us."
> A. Yes.
> . . .
> Q. When you said "they have been using our facilities," what facilities were you referring to?
> A. *I refer [to] the Mariel port, or the port of Mariel*.

---

[2] Ms. Fernandez's niece, Emma Blanco, read Ms. Fernandez the interrogatory responses in her native Spanish before Ms. Fernandez verified the interrogatory responses by signing them. *See* Exh. A at 177:6-7; 177:18; *see also*, Exh. H at 62:19 – 65:25. On January 27, 2022, Ms. Fernandez served her amended interrogatory responses. Her amended interrogatory responses did not change her interrogatory responses cited herein.

> . . .
> Q. ***So when you said that Seaboard Marine was using facilities that your family owned, is that what you are referring to, San Ramon?***
> A. ***Yes, sir.***
> . . .
> Q. ***How did Seaboard Marine use San Ramon?***
> A. Well, for [their] business . . . Seaboard Marine was using a property that we used to own and [it's] been 62 years that we haven't been there. ***The property was ours.***
> . . .
> ***We used to have business, you know, in the port. The port. Not San Ramon. San Ramon doesn't exist anymore.*** They destroy[ed] it.

Exh. D, Dec. 14, 66:1-22 (emphasis added).

Consistent with both Ms. Fernandez and Seaboard's counsel referring to the property as "the port of Mariel," the "business," and "San Ramon" instead of using the actual corporate names, Ms. Fernandez repeatedly testified that she could not recall the names of the entities that held her ownership interests in the family businesses. Exh. C, Dec. 17, 76:11-13; 80:15-19; 92:08-16; 93:06-24; 107:03-12.

## II. Seaboard Marine's Misuse of Ms. Fernandez's Testimony

Despite all the preceding detailed testimony about her ownership interests, Seaboard has made numerous untrue and misleading representations in Court filings, such as:

- "Plaintiff testified she did not own the Cuban property at issue . . ." ECF No. 115 at p. 3.
    - *Untrue*: "The property was ours." Exh. D, Dec. 14, 66:1-22; Exh. C, Dec. 17; 151:24-25 ("Q: Did you own the Mariel dock before you left Cuba? A: Yes"); *see also* 151:7-153:3; 155:2-5; 156:25-157:3 (Plaintiff and her family owned the Mariel dock); *id.* at 84:5 – 85:6 (Plaintiff and her family owned Central San Ramon when they fled Cuba); *id.* at 158:10-159:2 (Plaintiff and her family owned the Concession to develop the Mariel dock).

- "[T]here is no evidence that Plaintiff possessed an ownership interest in these companies . . ." ECF No. 113 at p. 6. "There is thus no evidence – either testimonial or documentary –

7

from which a trier of fact could conclude that Fernandez owned any of the companies confiscated by the Cuban Government." ECF No. 93 at p. 12.

- o *Untrue*: Plaintiff testified she received "[t]he dividends for what had been earned throughout the year," including $5,000 per year "***from the business***." Exh. D, Dec. 14, 47:23-24; 49:03-05 (emphasis added); *see also* Exh. D, Dec. 14, 66:1-22 ("The property was ours."); Exh. C, Dec. 17; 151:24-25 ("Q: Did you own the Mariel dock before you left Cuba? A: Yes."); *id.* at 151:7-153:3; 155:2-5; 156:25-157:3 (Plaintiff and her family owned the Mariel dock); *id.* at 84:5 – 85:6 (Plaintiff and her family owned Central San Ramon when they fled Cuba); *id.* at 158:10-159:2 (Plaintiff and her family owned the Concession to develop the Mariel dock); *see* documents cited *infra* n.5.

- "At her deposition, Plaintiff testified that she has no knowledge of Maritima Mariel, S.A. or Compania Azucarera Mariel S.A. or whether she had an ownership interest." ECF No. 110 at p. 3.

  - o *Misleading*: Plaintiff testified she owned the family businesses and their assets that Cuba confiscated (*see supra* citations to testimony) but did not recall the names of the corporate entities. Exh. C, Dec. 17, 81:1-83:6; 124:2-25.

These are just a few of the false and misleading statements that Seaboard has included in seven Court filings since Ms. Fernandez's deposition.[3] *See* ECF Nos. 93, 110, 113, 115, 123, 145, 155. They all stem from the brief exchanges Seaboard takes out of context concerning the corporate names. After establishing Ms. Fernandez could not recall the "title owner" of the various business assets, and at the end of the deposition, Seaboard's counsel quizzed the then 91-year-old Ms. Fernandez at length about those corporate names:

> Q. [W]hat do you remember about a company that was known as Maritima Mariel SA?
> A. Anything, no. No recall, at all. I remember the name, but that's it. I don't remember, but they do what they did or what they own. I don't remember.
> . . .

---

[3] As Seaboard itself repeatedly describes the ownership issue as a "central issue" in this case, these misrepresentations of the record to the Court are particularly troubling. *See Redding v. Nova Se. Univ., Inc.*, 165 F. Supp. 3d 1274, 1301 (S.D. Fla. 2016) (*sua sponte* ordering counsel to show cause why they misrepresented testimony to the Court on a central issue).

| | |
|---|---|
| Q. | When was Maritima Mariel SA formed? |
| A. | I don't know. |
| Q. | When was Maritima SA organized? |
| A. | I don't remember. |
| Q. | Who, from 1954 to 1959, owned Maritima Mariel SA? |
| A. | I don't remember. |
| Q. | Did your father, Alfredo, Sr., own Maritima Mariel SA? |
| A. | I don't recall, sir. |
| Q. | You don't know Maritima Mariel SA, do you? |
| A. | As to what? |
| Q. | You don't own Maritima Mariel SA, do you? |
| A. | No. |
| Q. | You've never owned Maritima Mariel SA, have you? |
| A. | No, no, no. You're asking me if I was one of the owners of Maritima Mariel; I don't know. |
| Q. | Well, were you ever a shareholder in the company known as Maritima Mariel SA? |
| A. | I have to answer you yes or no. No. |

Exh. C, Dec. 17, 124-125.

Although Ms. Fernandez didn't recall Maritima Mariel SA at her deposition, she testified that she owned the Concession:

| | |
|---|---|
| Q. | Let's kind of focus before Castro. |
| A. | Uh-huh. |
| Q. | All right? Maybe say 1954, 1955. |
| A. | Uh-huh. |
| Q. | Did the Cuban government then give any concession or give you or your family any rights to build or develop any particular venues? |
| A. | Yes, sir. |
| Q. | Okay. So, that was a concession given by the Cuban government? |
| A. | Yes, before Fidel. Q. Before Fidel? |
| A. | Yeah, '54 or '55. |
| Q. | And who did Fidel -- who did the government, in '54 and '55, give the concession to? |
| A. | To whom? The concession? To my family. |
| Q. | Everyone in your family? |
| A. | Yes. |

Exh. C, Dec. 17, 158:10 – 159:2.

9

Seaboard ignores this testimony and focuses only on the exchange relating to her memory of the corporate names. But Ms. Fernandez and Seaboard's counsel established three things: (1) Ms. Fernandez owned the family businesses (including their assets – the land and the Concession) and received annual dividends as a shareholder; (2) Ms. Fernandez did not recall the family business names; and (3) Seaboard's counsel and Ms. Fernandez would use the phrases like "San Ramon" or "family business" or "sugar mill" to refer to them. Indeed, throughout, Ms. Fernandez testified that she did not know how her ownership interests were titled. Exh. C, Dec. 17, 76:11-13; 80:15-19; 92:08-16; 93:06-24; 107:03-12. So quizzing Ms. Fernandez on corporate formalities at the end of her five plus hours of deposition questioning by Seaboard's counsel was a game of "gotcha" that Seaboard has now taken out of context in seven Court filings to represent (incorrectly) that Ms. Fernandez "testified she did not own the Cuban property at issue." ECF No. 115 at p. 3; *see also* ECF Nos. 93, 110, 113, 123, 145, 155.

### III.   Ms. Fernandez's Errata Sheet

Following Seaboard's first instance of mischaracterizing Ms. Fernandez's testimony (*see* ECF No. 93 at pp. 1, 5-8), Ms. Fernandez timely served an errata sheet. There are 23 entries on Ms. Fernandez's errata sheet that generally fall into three categories: (1) correcting Ms. Fernandez's mistaken recollection that her father had an interest in the family business and its assets; (2) supplying her and her brothers' percentage ownership interests in the family business that she could not recall when asked during her deposition; and (3) two entries repeating her testimony that she could not recall the family business names but she was an equal owner with her brothers. There is nothing groundbreaking about her changes. They are not material changes.

10

They do not contradict her testimony. They do not re-write her testimony. They simply make the type of changes for which errata sheets exist.

## LEGAL STANDARD

Rule 30(e) permits a witness to make any changes "in form or substance" to their deposition testimony within 30 days after being notified that the transcript is available. Fed.R.Civ.P. 30(e). There is both a narrow and broad interpretation of permissible Rule 30(e) changes. Although the *See* Eleventh Circuit has not ruled on the issue, there is a long line of decisions in this District expressly adopting a broad interpretation that permits substantive changes, reasoning in part that parties are free to question the witness about those changes at trial.[4] A recent decision summarized the approach of courts within the Eleventh Circuit:

> Plaintiffs correctly argue that courts within the Eleventh Circuit allow a witness to make changes of the kind made by this witness. Generally, witnesses may add to or revise testimony "in order ***to clarify, expound upon, and correct*** deposition answers." And clarifications or corrections that are in line with the witness's other testimony or documents in the case are typically allowed.

*Ethicon Physiomesh Flexible Composite Hernia Mesh Prod. Liab. Litig. v. Ethicon, Inc.*, 2020 WL 9887566, at *7 (N.D. Ga. Dec. 4, 2020) (citations omitted) (emphasis added).

---

[4] *Chavez v. Arancedo*, 2018 WL 11346673, at *3 (S.D. Fla. May 24, 2018) ("Rule 30(e) should be broadly interpreted . . . ."); *Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 2016 WL 7443291, at *1 (S.D. Fla. Dec. 14, 2016) ("I find the broader reading . . . more persuasive."); *Maharaj v. GEICO Cas. Co.*, 996 F. Supp. 2d 1303, 1311 (S.D. Fla. 2014) ("The Court finds the line of cases adopting a broad interpretation of the Rule to be more persuasive and more consistent with the actual language of Rule 30(e)."); *AIG Centennial Ins. Co. v. O'Neill*, 2010 WL 4363176, at *5 (S.D. Fla. Oct. 22, 2010) ("This Court, however, finds itself persuaded by the broader reading of the rule."); *Cultivos Yadran S.A. v. Rodriguez*, 258 F.R.D. 530, 533 (S.D. Fla. 2009) ("The undersigned is persuaded by the majority view interpreting Rule 30(e) broadly.").

However, Seaboard principally relies on one decision from this District that acknowledged both the narrow and broad interpretations and did not expressly adopt either but found that an errata sheet should be stricken where "testimony is entirely altered to reflect a completely different answer." *Eldridge v. Pet Supermarket, Inc.*, 2019 WL 3302348, at *2 (S.D. Fla. July 23, 2019). Those types of "material changes, especially when contradictory" are only permissible with "good reason." *Id*. Although Seaboard cites *Eldridge* for the proposition that "'clarifying the record' is an insufficient justification for material changes" (ECF No. 155 at p. 6), that is incorrect. In fact, *Elridge* expressly permitted errata changes that "merely clarify and provide more detailed context" to the deposition testimony. *Eldridge*, 2019 WL 3302348, at *3 (citing *Est. of Duckett v. Cable News Network LLLP*, 2010 WL 11508194, at *2 (M.D. Fla. May 14, 2010)). Moreover, Seaboard acknowledges an errata sheet may be used to make "corrective" changes. ECF No. 155 at p. 3 (citing *Norelus v. Denny's Inc.*, 628 F.3d 1270, 1273 (11th Cir. 2010)).

## ARGUMENT

Seaboard failed to satisfy the legal standard to strike an errata sheet. Ms. Fernandez's changes clarify, expand upon, and correct her testimony in line with her other testimony and documents in this case. *Ethicon, Inc.*, 2020 WL 9887566, at *7. Moreover, Ms. Fernandez did not make any material changes. Even if her changes could be considered material, they were made for "good reason" – in particular, Seaboard's counsel's inappropriate and confusing questioning of Ms. Fernandez, Seaboard's counsel's refusal to permit Ms. Fernandez's counsel to question her, and Seaboard's repeated false and misleading characterizations of her testimony. *Eldridge*, 2019 WL 3302348, at *3.

First, throughout the deposition, Ms. Fernandez testified that her family businesses and their assets were owned by her, her brothers, *and her father*. The majority of Ms. Fernandez's errata sheet entries – 15 of the 23 – simply correct her mistaken recollection at the time that her father was one of the owners. Correcting this mistaken recollection from over 60 years ago is not a material change. It does nothing to contradict, rebut, or change Ms. Fernandez's testimony that she also owned her family's businesses and their assets – what Seaboard describes in the Motion to Strike as "a central issue in this case." ECF No. 155 at p. 1. Moreover, it is consistent with Plaintiff's interrogatory responses, as well as the case documents.[5] There is no legal basis to strike these changes and Seaboard is free to ask Ms. Fernandez about them at trial.

Next, four of the changes identify the exact ownership interest of her and her brothers (20% each) because Ms. Fernandez could not recall that during her deposition.[6] But Seaboard already knew those ownership percentages from Ms. Fernandez's interrogatory responses. *See* Exhibit E. Moreover, Ms. Fernandez's niece testified to this as well. *See* Emma Blanco Deposition Tr.,

---

[5] For example, the Confiscatory Decree states that Plaintiff owned capital shares in the companies. Exh. B at Plf. 001099. *Empresas de Cuba 1959*, a Cuban history book, identifies the "Blanco Rosell siblings" as the owners of Azucarera Central Ramona S.A., and identifies the officers of the company. Exh. F (*see* Certified English Translation); *Property Owners of Cuba 1959*, another Cuban history book, identifies Alfredo Blanco Rosell and his siblings as the owners of Maritima Mariel, SA. Exh. G (Certified English Translation); *see also Revolution*, September 8, 1960, *Sixteen Companies Confiscated from Blanco Rosells.* Exh. K (Certified English Translation); *La Habana* (September 8, 1960), *The Assets of the Blanco Rosell Siblings Confiscated*. Exh. L (Certified English Translation); Business Records of Fronsa Corp., Miami, Florida, discussing Blanco Rosell family's Cuba property holdings. Exh. M at Plf.006400; Exh. N at Plf.006243 (Blanco Rosell family assets in Cuba comprised "2 sugar mills and refineries, with ancillary installations, port facilities, cane plantations, lands."

[6] *See* Exh. C, Dec. 17, 85:07-25 (asking for specific percentage ownership interests of each sibling).

attached as Exhibit H at 31:13-15 ("[T]he companies were set up such that each of the brothers and sisters – each of the siblings had 20 percent of the shares."). So these changes neither contradict her testimony nor make any material change to it. There is no legal basis to strike these changes.

Two of the changes add that Ms. Fernandez's niece read the interrogatory responses to her in Spanish, a fact she forgot to mention during her deposition. Seaboard then deposed Ms. Fernandez's niece to confirm that testimony. That is not a material change and Seaboard does not even appear to challenge those changes in its motion.

The final two changes are the crux of Seaboard's complaints. As explained above, in numerous court filings, Seaboard has built the false narrative that Ms. Fernandez disclaimed any ownership interest in her family businesses. Seaboard accomplished this by ignoring the bulk of her testimony, concealing the fact that counsel and Ms. Fernandez used "San Ramon" and "family business" to refer to the businesses instead of their corporate names, and, most importantly, mischaracterizing two brief exchanges. The first exchange (with the accompanying errata change) was:

> Q. Do you have any ownership interest in Azucarera Mariel; do you?
> A. I don't know.
> Q. You've not heard of that company until I just mentioned it today, right? This was the first time you've heard of it?
> A. I don't know. I don't recall. I don't think so. [**CHANGED TO**: I do not recall the names of all of the family businesses, but I do recall that I was an equal owner in the family's businesses with my four brothers.]

Exh. C, Dec. 17, 81:19-25. The second exchange (with the accompanying errata change) was:

> Q. You don't know Maritima Mariel SA, do you?
> A. As to what?

14

| | | |
|---|---|---|
| Q. | | You don't own Maritima Mariel SA, do you? |
| A. | | No. |
| Q. | | You've never owned Maritima Mariel SA, have you? |
| A. | | No, no, no.  You're asking me if I was one of the owners of Maritima Mariel; I don't know. |
| Q. | | Well, were you ever a shareholder in the company known as Maritima Mariel SA? |
| A. | | I have to answer you yes or no.  No. [**CHANGED TO**:  As I previously testified, I do not recall the names of the family businesses, but I do recall that I was an equal owner in the family businesses with my four brothers.] |

Exh. C, Dec. 17, 124-125.

These errata changes are consistent with Ms. Fernandez's repeated testimony identifying her ownership of all the assets of her family businesses but not recalling the "title owner" business names.  *See* Section I, *infra*.  They are also consistent with her interrogatory responses and other documents in this case.[7]  Moreover, her errata changes are consistent with testimony Seaboard obtained from multiple other family members.[8]

These are not material changes.  Ms. Fernandez's testimony is not "entirely altered to reflect a completely different answer."  *Eldridge v. Pet Supermarket, Inc.*, 2019 WL 3302348, at *2 (S.D. Fla. July 23, 2019).  Even if these could be considered material changes, Ms. Fernandez had good reason to make them.  With respect to Maritima Mariel, Ms. Fernandez identifies the false premise of the question in her answer, saying "I have to answer you yes or no.  No."  Seaboard

---

[7] *See supra* n. 5.

[8] *See* Emma Blanco deposition testimony, attached as Exhibit H at 31:13-15 ("the companies were set up such that each of the brothers and sisters – each of the siblings had 20 percent of the shares"); Liana Blanco deposition testimony, attached as Exhibit I at 35 (identifying her grandfather, his four sons, and Odette as owning shares in the family business and explaining "they shared equally"); Eduardo Blanco deposition testimony, attached as Exhibit J at 43-46 (testifying that his father, his uncles, and Aunt Odette owned the family business).

addresses this in a footnote with a bizarre argument. Seaboard says it "is not credible" to believe Ms. Fernandez thought she could only answer with a yes or a no because she answered other yes or no questions with "I don't recall." ECF No. 155 at p. 7 n.5. That is, in Seaboard's opinion, Ms. Fernandez actual words – "I have to answer you yes or no" – should not be believed. But Ms. Fernandez was not attempting to fool anyone as to what she understood about the question. She did not recall the corporate name but Seaboard's counsel repeatedly asked the same questions to her in immediate succession: (1) "You don't know Maritima Mariel SA, do you?" (2) "You don't own Maritima Mariel SA, do you?" (3) "You've never owned Maritima Mariel SA, have you?" (4) "Well, were you ever a shareholder in the company known as Maritima Mariel SA?" Ms. Fernandez has good reason to correct a single answer that was given with the clear misunderstanding on the record that she thought she had to answer yes or no, even though she previously answered that same question "I don't know."

The same is true for the exchange regarding Azucarera Mariel. Ms. Fernandez testified she did not recall the corporate name. Her errata change adds: "I do not recall the names of all of the family businesses, but I do recall that I was an equal owner in the family's businesses with my four brothers." Even under the *Eldridge* case cited by Seaboard, this is a permissible errata change meant to "merely clarify and provide more detailed context" to the deposition testimony. *Eldridge*, 2019 WL 3302348, at *3 (citing *Est. of Duckett v. Cable News Network LLLP*, 2010 WL 11508194, at *2 (M.D. Fla. May 14, 2010)).

Moreover, counsel for Ms. Fernandez did not have an opportunity to question her following Seaboard's counsel's questioning. By the end of Seaboard's counsel's questioning, Ms. Fernandez

16

was exhausted and falling asleep during breaks.  *See* Exh. H at 73-80.  Ms. Fernandez's counsel stated: "I do have questions.  Given the hour and she's been here so long, I'm going to reserve my questions." Dec. 17, at 179:12-14.  Seaboard's counsel immediately responded: "No way.  We're going to finish this today." *Id*. at 179:15-16.  Seaboard's counsel demanded Ms. Fernandez either finish her deposition that evening or the next morning, a Saturday morning on which Ms. Fernandez was departing for a long-planned holiday visit with her daughter in Atlanta.  *See* Exh. H at 77:10-78:4. Following the holiday travel schedule of both parties and counsel, Ms. Fernandez's counsel asked to schedule the examination of Ms. Fernandez and Seaboard's counsel refused.  *See* ECF No. 155 at Exh. E.  Ms. Fernandez reserves the right to request permission to complete Ms. Fernandez's deposition, as Seaboard's counsel denied Ms. Fernandez's counsel the right to cross-examination permitted under the Rules.  Fed.R.Civ.P. 30(c).

## CONCLUSION

Seaboard Marine's motion to strike fails to satisfy the legal burden required to strike an errata sheet.  It should be denied.

Dated:  April 8, 2022                                     Respectfully submitted,

| | |
|---|---|
| David A. Baron (admitted *pro hac vice*) | s/ John S. Gaebe |
| dbaron@bcr-dc.com | John S. Gaebe (Florida Bar No. 304824) |
| Melvin White (admitted *pro hac vice*) | LAW OFFICES OF JOHN S. GAEBE P.A. |
| mwhite@bcr-dc.com | 5870 SW 96 St. |
| Laina C. Lopez (admitted *pro hac vice*) | Miami, Florida  33156 |
| lcl@bcr-dc.com | johngaebe@gaebelaw.com |
| Berliner Corcoran & Rowe LLP 1101 17th Street, N.W., Suite 1100 | Telephone: (305) 607-4755 |
| Washington, D.C. 20036-4798 | David J. Horr |
| Tel:  (202) 293-5555 | Florida Bar. No. 310761 |
| Facsimile:  (202) 293-9035 | dhorr@admiral-law.com |
| | William R. Boeringer Florida |

Richard W. Fields (admitted *pro hac vice*)
fields@fieldslawpllc.com
Martin Cunniff (admitted *pro hac vice*)
MartinCunniff@fieldslawpllc.com
Fields PLLC
1701 Pennsylvania Ave, N.W., Suite 200
Washington, D.C. 20006
Tel:  (833) 382-9816

*Counsel for Plaintiffs*

Bar No. 347191
wboeringer@admiral-law.com
William B. Milliken
Florida Bar No. 143193
wmilliken@admiral-law.com
Horr, Novak & Skipp, P.A.
Two Datran Center, Suite 1700
9130 S. Dadeland Boulevard
Miami, Florida 33156
Telephone: (305) 670-2525
Facsimile: (305) 670-2526

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of April 2022, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/ John S. Gaebe*
John S. Gaebe