## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-cv-25176-BLOOM/Otazo-Reyes

ODETTE BLANCO DE FERNANDEZ,
*née* Blanco Rosell,

      Plaintiff,

v.

SEABOARD MARINE, LTD.,

      Defendant.

_____/

## <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** is before the Court upon Defendant Seaboard Marine Ltd.'s ("Defendant" or "Seaboard Marine") Motion for Summary Judgment, ECF No. [177] ("Motion"), along with the corresponding Statement of Material Facts, ECF No. [177-1] ("SMF"). Plaintiff Odette Blanco De Fernandez ("Plaintiff") filed a Response in Opposition, ECF No. [197] ("Response"), and her Opposition to the SMF, ECF No. [198] ("Opposition SMF"). Defendant filed a Reply to Plaintiff's Response, ECF No. [219] ("Reply"), and its Reply to the Opposition to the SMF, ECF No. [220] ("Reply SMF"). The Court has carefully considered the Motion, all opposing and supporting submissions, the record in the case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is granted.

### I.    BACKGROUND

On December 20, 2020, Plaintiff initiated this action against Defendant to recover damages under Title III of the Cuban Liberty and Democratic Solidarity ("LIBERTAD") Act of 1996, codified by 22 U.S.C. § 6021, *et seq*. ("Helms-Burton Act" or "Act"), for trafficking in property that the Cuban Government confiscated. *See* ECF No. [1]. Plaintiff thereafter filed an Amended

Complaint. *See* ECF No. [45] ("Amended Complaint"). According to the Amended Complaint, Plaintiff and her four siblings ("Blanco Rosell Siblings") owned various corporations and assets in Cuba that the Cuban Government confiscated in 1960. *See id.* ¶¶ 4, 66-73. Plaintiff seeks to hold Defendant liable under Title III of the Act for "trafficking" in the confiscated property. *See* 22 U.S.C. § 6082(a)(1)(A).

In the instant Motion, Defendant seeks summary judgment in its favor because (1) Plaintiff does not own a claim to property confiscated by the Cuban Government; (2) Seaboard Marine did not traffic in any confiscated property; (3) Seaboard Marine did not "knowingly and intentionally" traffic in the confiscated property; (4) Seaboard Marine did not traffic through the Mariel Special Economic Zone ("ZEDM"); (5) there is no competent evidence of Plaintiff's damages; and (6) Seaboard Marine's use of the Container Terminal was incident to lawful travel to Cuba and necessary to the conduct of such travel. *See* ECF No. [177]. Plaintiff responds that (1) Plaintiff owns a claim to the confiscated property; (2) Seaboard Marine trafficked in the confiscated property; (3) Seaboard Marine trafficked through the ZEDM; (4) Seaboard Marine's trafficking was knowing and intentional; (5) Seaboard Marine cannot invoke the lawful travel defense; and (6) Plaintiff proffered competent evidence of damages. *See* ECF No. [197].

## II.   MATERIAL FACTS

Based on the parties' statements of material facts in support of and in opposition to the Motion, along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

Seaboard Marine is an ocean transportation company that transports goods by vessels from point A to point B. ECF No. [177-1] ¶ 1.[1] Plaintiff was born in Santiago de Cuba, Cuba on January 27, 1930. ECF Nos. [177-1] ¶ 4, [198] ¶ 4. Plaintiff has four brothers, Alfredo, Florentino, Enrique, and Byron, and one sister, Marie Hebe. ECF Nos. [177-1] ¶ 5, [198] ¶ 5.

Plaintiff claims that in 1960, the Cuban Government confiscated certain property from her family, including the companies Maritima Mariel S.A. ("Maritima Mariel"), Compania Azucarera Mariel S.A. ("Azucarera Mariel"), a 70-year concession held by Maritima Mariel, and land holdings of Azucarera Mariel. ECF Nos. [177-1] ¶ 7, [198] ¶ 7.

In response to Seaboard Marine's Interrogatories to Plaintiff, Plaintiff stated that "[t]he Blanco Rosell Siblings each owned 20% of Azucarera Mariel S.A. [and] Maritima Mariel." ECF Nos. [177-1] ¶ 17, [198] ¶ 17. Plaintiff stated that the "Blanco Rosell Siblings" were "Plaintiff and her deceased brothers, Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell." ECF Nos. [177-1] ¶ 17, [198] ¶ 17.[2]

The Bay of Mariel ("Bay" or "Mariel Bay") is located on the northwest coast of Cuba. ECF Nos. [177-1] ¶ 23, [198] ¶ 23. On the west side of the Bay of Mariel is a body of land called the Angosta Peninsula. ECF Nos. [177-1] ¶ 24, [198] ¶ 24. Members of the Balsinde family owned land on the Angosta Peninsula. ECF Nos. [177-1] ¶ 25, [198] ¶ 25.

---

[1] Plaintiff disputes Defendant's phrasing. Plaintiff states that Seaboard Marine is an "ocean carrier." ECF No. [198] ¶ 1. The distinction is immaterial for the purposes of addressing the Motion.

[2] The parties omit the name of the fourth brother, Byron, who was mentioned elsewhere in the SMF, Opposition to the SMF, and Plaintiff's deposition. *See* ECF Nos. [177-1] ¶ 5, [198] ¶ 5, [180-4] at 13. The fact that the parties omit the name of the fourth brother when defining the Blanco Rosell Siblings appears to be scrivener's error. Regardless, the omission is immaterial for the purposes of addressing the Motion, given that the parties agree that Plaintiff claims to have a 20% stake in Maritima Mariel and Azucarera Mariel.

Defendant states that the Cuban Government purchased the land on the Angosta Peninsula for the purpose of building a naval air station, which it built prior to January 1, 1959. ECF No. [177-1] ¶ 26. Defendant includes a map of the naval air station from Plaintiff's expert Scott Edmonds' ("Edmonds") initial and supplemental expert reports, which show the naval air station on the west side of Mariel Bay. *See id.* Plaintiff disputes Defendant's characterization that the Cuban Government purchased the land and contends that the Cuban Government forcibly expropriated seven (7) caballerias of land for the naval air station and paid a court-determined value years later. ECF No. [198] ¶ 26. However, Plaintiff does not otherwise dispute that the map prepared by her expert Edmonds shows the footprint of the naval air station and that the naval air station was built prior to January 1, 1959. *See id.*

In 1902, Ramon Balsinde built a wooden dock on the east side of the Bay of Mariel, next to the town of Mariel. ECF Nos. [177-1] ¶ 33, [198] ¶ 33. In the early 1900's, the wooden dock was used to export sugar and was operated by members of the Balsinde family and then by Central San Ramon, S.A. ("Central San Ramon"), a company owned by members of the Balsinde family. ECF Nos. [177-1] ¶ 34.[3] In 1934, the Cuban Government granted to Central San Ramon a concession for private use (Decree No. 1655 or "1934 Concession"), recognizing the legality of the private use of that town dock. ECF Nos. [177-1] ¶ 35, [198] ¶ 35. The 1934 Concession describes the location of the dock as "Punta Coco Solo" and declares "the legal existence of the dock and warehouses which, for private use, the Corporation 'Central San Ramon, S.A.' possesses on the littoral of the Port of Mariel, at a place known as Punta Coco Solo." ECF Nos. [177-1] ¶ 36, [198] ¶ 36.

---

[3] Plaintiff argues that the dock was used "exclusively" for exporting sugar. ECF No. [198] ¶ 34. The distinction is immaterial for the purposes of addressing the Motion.

Plaintiff's father Alfredo Blanco Calas, Sr. purchased Central San Ramon in or around 1949. ECF Nos. [177-1] ¶ 38.[4] Plaintiff claims that Azucarera Mariel owned and operated Central San Ramon. ECF Nos. [177-1] ¶ 8, [198] ¶ 8. On August 3, 1955, the Cuban Government granted to Maritima Mariel the right to "plan, study, execute, maintain, and exploit public docks and warehouses in Mariel Bay" and construct "a Maritime Terminal." ECF Nos. [200-4] at 11 ("1955 Concession"), [177-1] ¶ 41, [198] ¶ 41.[5]

In 2018, Seaboard Marine was approached by Boston Agrex, a shipper of poultry based in Boston, regarding the prospect of transporting frozen chicken to the Container Terminal at the Port of Mariel in Cuba. ECF No. [177-1] ¶ 57.[6] Beginning in May 2019, Seaboard Marine has transported frozen chicken in refrigerated containers from the United States to Cuba. ECF No. [177-1] ¶ 58.[7] For all transports of containers by Seaboard Marine to the Container Terminal, Seaboard Marine docks vessels at the berths of the Container Terminal on the west side of the Bay of Mariel. ECF No. [177-1] ¶ 60.[8]

---

[4] Plaintiff disputes Defendant's phrasing, arguing that Plaintiff's father did not purchase Central San Ramon. Plaintiff submits that Plaintiff's father purchased the sugar mill and sugar fields that belonged to Central San Ramon. *See* ECF No. [198] ¶ 38. However, Plaintiff later states that "the Blanco Rosell family acquired Central San Ramon from the Balsinde family in 1949." *Id.* ¶ 104. Plaintiff also states that "Plaintiff's father owned two sugar mills, Central Ramona *and Central San Ramon*." *Id.* ¶ 6 (emphasis added). Further, as noted below, Plaintiff agrees that Azucarera Mariel owned and operated Central San Ramon. *See id.* ¶ 8.

[5] The parties dispute the exact phrasing of the above fact. A review of the 1955 Concession supports the above phrasing. *See* ECF No. [200-4] at 11.

[6] Plaintiff disputes Defendant's phrasing. Plaintiff states that the transportation of goods to Cuba was an "export transaction" not a "travel transaction." ECF No. [198] ¶ 57. However, Defendant does not phrase the transportation of goods as a "travel transaction." Regardless, the distinction is immaterial for the purposes of addressing the Motion.

[7] As before, Plaintiff disputes Defendant's phrasing. Plaintiff maintains that the transportation of goods to Cuba was an "export transaction" not a "travel transaction." ECF No. [198] ¶ 58.

[8] Plaintiff disputes Defendant's phrasing. Plaintiff maintains that the transportation of goods to Cuba was an "export transaction" not a "travel transaction." ECF No. [198] ¶ 60.

### III.    LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including, among other things, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which 'are jury functions, not those of a judge.'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *see also Crocker v. Beatty,* 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant."). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990). The Court does not weigh conflicting evidence.

*See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of demonstrating the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Yet, even where a non-moving party neglects to submit any alleged material facts in dispute, a court must still be satisfied that the evidence in the record supports the uncontroverted material facts proposed by the movant before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Mia., Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004). Indeed, even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

## IV.   DISCUSSION

As noted above, Defendant seeks summary judgment in its favor because (1) Plaintiff does not own a claim to property confiscated by the Cuban Government; (2) Seaboard Marine did not

traffic in any confiscated property; (3) Seaboard Marine did not "knowingly and intentionally" traffic in the confiscated property; (4) Seaboard Marine did not traffic through the ZEDM; (5) there is no competent evidence of Plaintiff's damages; and (6) Seaboard Marine's use of the Container Terminal was incident to lawful travel to Cuba and necessary to the conduct of such travel. *See* ECF No. [177]. Plaintiff responds that (1) Plaintiff owns a claim to the confiscated property; (2) Seaboard Marine trafficked in the confiscated property; (3) Seaboard Marine trafficked through the ZEDM; (4) Seaboard Marine's trafficking was knowing and intentional; (5) Seaboard Marine cannot invoke the lawful travel defense; and (6) Plaintiff proffered competent evidence of damages. Defendant further argues that if Defendant prevails on any one of the issues raised, Defendant is entitled to summary judgment. *See* ECF No. [197]. The Court addresses Defendant's arguments in turn.

## A. Ownership

As an initial matter, Title III of the Helms-Burton Act requires "proof of ownership of claims to confiscated property." 22 U.S.C. § 6083. A plaintiff may provide proof of ownership through a claim certified by the Foreign Claims Settlement Commission ("FCSC"), which the Court must accept as conclusive proof of ownership. *See id.* If there is no certified claim, courts must "make determinations regarding the amount and ownership of the claim." *Id.* In this case, because there is no certified claim, the Court must determine the amount and ownership of Plaintiff's claim. That is, the Court must determine whether there is any evidence that Plaintiff owns a claim to property confiscated by the Cuban Government.

Defendant first argues that Plaintiff cannot present competent evidence for the jury to find that Plaintiff owns a claim to property confiscated by the Cuban Government. *See* ECF No. [177] at 16-21. Defendant's argument relies on the premise that Plaintiff does not have admissible

evidence showing that she owns a claim to Maritima Mariel or Azucarera Mariel. Defendant avers that Plaintiff's testimony and interrogatory responses are not based on her personal knowledge and do not demonstrate her ownership of the companies. Further, Plaintiff does not have any documentary evidence to support her ownership of the companies. *See id.* In addition, Defendant argues that, even if Plaintiff could adduce admissible evidence that she has an ownership interest in the companies, Plaintiff does not own a claim to any land or concessionary rights held by those companies to form the basis of her claim under the Act. *See id.* at 21-22. Maritima Mariel – not Plaintiff – was granted the 1955 Concession, and a minority stake in Maritima Mariel cannot be the basis for a claim under the Act. *See id.* Similarly, Azucarera Mariel – not Plaintiff – owned the land, and a minority stake in Azucarera Mariel cannot be the basis for a claim under the Act. *See id.*

Plaintiff responds that she has an ownership interest in her family's businesses and that her testimony, her family members' testimony, her interrogatory responses, and various documents provide sufficient evidence to support her claim of ownership. *See* ECF No. [197] at 12-20. Further, Plaintiff argues that Defendant's interpretation of the Act – that forecloses Plaintiff's claim because the companies, not Plaintiff, were granted the 1955 Concession and owned the land – would unduly narrow Title III's broad authorization of a civil remedy for any claimant "who owns the claim to such property." 22 U.S.C. § 6082(a)(1)(A). Plaintiff argues that Defendant's "reading of the statute would require the Court to delete the word 'claim' from the phrase 'owns the claim to such property,' and effectively rewrite Helms-Burton to cover only those plaintiffs who 'own such property.'" *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1290 (S.D. Fla. 2019); *see de Fernandez v. Crowley Holdings, Inc.*, No. 21-cv-20443, 2022 WL 860373,

at *5 (S.D. Fla. Mar. 23, 2022) (finding that the plaintiffs sufficiently alleged ownership of a claim based on their ownership of companies whose assets were confiscated).

The Court agrees with Plaintiff. First, Plaintiff testified that although she could not recall the corporate names of her family's businesses, she attended corporate meetings with her brothers and received annual dividends "from the business," ECF No. [179-4] at 49-51, and her family owned the sugar mill, sugar cane fields surrounding the sugar mill, the family home called Tapia, and other property around the Bay of Mariel, *see id.* at 26-27, 32-33. Such testimony is sufficient for "a reasonable trier of fact [to] return judgment for [Plaintiff]" on the issue of Plaintiff's ownership of Maritima Mariel and Azucarera Mariel. *Miccosukee*, 516 F.3d at 1243. As such, Plaintiff presents a genuine issue of material fact with regard to Plaintiff's ownership of the companies. Given the Court's determination, the Court need not discuss whether other evidence could also persuade a reasonable trier of fact to return judgment in favor of Plaintiff.[9]

Second, with respect to Defendant's argument that the companies – not Plaintiff – were granted the 1955 Concession and owned the land and that her minority stake in the companies does not give her a claim under the Act, the Court is not persuaded. The Act states in relevant part: "any person that, after the end of the 3-month period beginning on the effective date of this subchapter, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national *who owns the claim to such property* for money damages . . . ." 22 U.S.C. § 6082(a)(1)(A) (emphasis added). As Plaintiff correctly argues, Defendant's reading of the Act would require the Court to delete the word "claim" from the phrase "owns the claim to such property," and to effectively rewrite the Act to cover only those plaintiffs

---

[9] To the extent that Defendant argues that Plaintiff's testimony was not based on personal knowledge and Plaintiff should not be permitted to serve errata changes to correct her testimony, the Court has already determined that Plaintiff is entitled to serve errata changes after refreshing her memory. *See* ECF No. [242].

who "own such property." *Garcia-Bengochea*, 407 F. Supp. 3d at 1290; *see also de Fernandez v. Crowley Holdings, Inc.*, 2022 WL 860373, at *5 (S.D. Fla. Mar. 23, 2022). The plain language of the Act makes clear that plaintiffs who own *a claim* to confiscated property – not plaintiffs who own the confiscated property – are entitled to relief under the Act. 22 U.S.C. § 6082(a)(1)(A). As such, Plaintiff may seek relief under the Act given that she owns a claim to the confiscated property through her stake in the companies. Given the plain language of the statute, the Court declines the parties' invitation to further analyze Congressional intent with respect to this particular clause of the Act.[10]

Further, the Court notes that Defendant's reliance on the *Havana Docks* cases[11] does not meaningfully advance Defendant's argument. *See* ECF No. [219] at 12. In those cases, the plaintiff was a company, Havana Docks, that owned a claim certified by the FCSC. In determining that Havana Docks could bring a lawsuit based upon its certified claim, the Court did not determine that only the corporate entity could bring a lawsuit for a claim and others who owned a stake in the corporate entity could not. *See, e.g.*, *Havana Docks Corp. v. Carnival Corp.*, No. 19-CV-21724, 2022 WL 831160, at *55 (S.D. Fla. Mar. 21, 2022).

In sum, Plaintiff has set forth sufficient evidence to suggest that she has an ownership interest in Maritima Mariel and Azucarera Mariel and can bring a claim under the Act. As such, Defendant's arguments on the issue of ownership are unavailing.[12]

---

[10] Defendant argues in a footnote that "[t]he holding in *Garcia-Bengochea* . . . is unpersuasive." ECF No. [177] at 22 n.7. Defendant appears to argue that *Garcia-Bengochea* was wrongly decided because the court misapplied the word "claim." For the reasons noted above, the Court agrees with the holding in *Garcia-Bengochea*, as well as *Crowley Holdings, Inc.*, which interpreted the Act in the same manner.

[11] For the purposes of this Order, the *Havana Docks* cases are *Havana Docks Corp. v. MSC Cruises SA Co.*, No. 19-cv-23588, *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, *Havana Docks Corp. v. Carnival Corp.*, No. 19-cv-21724, and *Havana Docks Corp. v. Royal Caribbean*, No. 19-cv-23590.

[12] The parties each seek to introduce numerous experts on this issue and filed several motions to strike the experts' reports or preclude the experts from testifying to the jury. *See* ECF Nos. [142], [176], [178-1],

### B. Confiscation and Trafficking

On the second issue, Defendant raises three overarching arguments. First, Defendant argues that Defendant did not traffic in any confiscated property because its activity took place on the Container Terminal, which is located on land that the Cuban Government purchased from the Balsinde family and has owned continuously since then. *See* ECF No. [177] at 25-27. Second, Defendant did not traffic in the land included in the 1955 Concession granted to Maritima Mariel because, according to Defendant's foreign law expert Ambar Diaz ("Diaz"), the 1955 Concession did not cover the Container Terminal and was limited to Punta Coco Solo on the east side of the Bay. *See id.* at 27-31. Third, even if Plaintiff could prove that the 1955 Concession granted rights to operate the entire Bay, including the Container Terminal, Defendant's conduct did not constitute trafficking. *See id.* at 31-33. Defendant did not sell, transfer, distribute, dispense, broker, manage, or otherwise dispose of the 1955 Concession, nor did it purchase, lease, receive, possess, obtain control of, manage, use, or otherwise acquire or hold an interest in the 1955 Concession. *See id.* (citing 22 U.S.C. § 6023(13)(A)(i) (defining "traffics")).

Plaintiff responds that the 1955 Concession included the entire Bay of Mariel, including the land upon which the Container Terminal stands because the text of the 1955 Concession includes no geographic limitation within the Bay. *See* ECF No. [197] at 22-24. Plaintiff also argues that the 1955 Concession included additional secondary rights to "all of the facilities" needed to

---

[221]. Based on the record, it appears that Plaintiff's experts Jaime Suchlicki ("Suchlicki") and Mauricio Tamargo ("Tamargo") and Defendant's expert Diaz seek to opine on issues at least tangentially related to Plaintiff's ownership claim. *See* ECF Nos. [195-2], [178-12], [178-33], [201-7]. For reasons stated in the Court's Order on the Motion to Strike, ECF No. [256] at 11-14, the Court does not consider Tamargo's Declaration, ECF No. [201-7]. Further, the Court's determination above was based on Plaintiff's testimony, which provides sufficient evidence of an ownership claim for the jury to find in her favor, and the plain reading of the Act, which permits anyone who owns a claim to confiscated property to bring a lawsuit. As such, the Court need not consider the experts' opinions or the pending *Daubert* Motions seeking to exclude Suchlicki and Diaz, ECF Nos. [178-1], [176], to address the ownership issue.

handle maritime trade in the entire Bay. *See id.* at 23. The secondary rights in the 1955 Concession

include:

- The right to occupy and use, on a temporary or permanent basis, lands or waters in the public domain or under private ownership and those of the State, province, or municipality, whenever necessary for the execution and exploitation of the Concession projects and works;

- The right of mandatory expropriation of any public or private real estate or property rights needed for the Concession's works, uses or services, including the use of any maritime or public domain property of the national, provincial or municipal governments;

- The right to evict any occupant from any property needed to carry out the purposes of the Concession, either temporarily or permanently, subject to paying one year of rent;

- The right to convert Maritima Mariel's docks and warehouses covered by a 1934 private use concession to public use and to charge fees for their use and to build new docks and warehouses in the Bay of Mariel and to charge fees for their use;

- The right to expand, adapt, or modify works under the Concession to meet the public use declaration objectives or increase public utility; and

- The right to issue mortgage bonds using the Concession as collateral.

*Id.* at 23-24 (internal citations omitted). As such, irrespective of whether the Cuban Government

purchased and owned the land in which the Container Terminal is located, Defendant trafficked in

confiscated property by trafficking in land granted to Maritima Mariel by the 1955 Concession. In

addition, Plaintiff argues that no choice of law analysis supports Defendant's application of Cuban

law in relying on Diaz, who applied Cuban law to opine that the scope of the 1955 Concession

was limited to Punta Coco Solo. *See id.* at 24-26. Plaintiff avers that U.S. law should apply and

Diaz's opinions are therefore unreliable. *See id.* at 24-28. Plaintiff also contends, alternatively, that

even were the Court to apply Cuban law, Diaz misapplies Cuban law, and the 1955 Concession

covers the entire Bay. *See id.* at 28-29.

Next, Plaintiff submits that even if the 1955 Concession did not include the entire Bay, Plaintiff has a claim to Azucarera Mariel, which owned property on the west side of the Bay, albeit not the naval air station where the Container Terminal is located. *See id.* at 30-35. Plaintiff argues that Defendant trafficked in the Mariel Empty Container Depot ("DCV") and the Mariel Container Terminal Office ("TCM-Office"), which are located on the west side of the Bay and on land that the Cuban Government confiscated when it confiscated Azucarera Mariel. *See id.* at 30, 33. Plaintiff stresses that Defendant used the DCV to store its empty containers. *See id.* at 32. Plaintiff further argues that the size and location of the Container Terminal present a genuine issue of material fact. *See id.* at 35-36. If the Container Terminal extends beyond the naval air station, as Plaintiff contends, then it is also located on land that the Cuban Government confiscated when the Cuban Government confiscated Azucarera Mariel. *See id.* As such, Plaintiff avers that Defendant trafficked in confiscated property to which Plaintiff has a claim.

Lastly, Plaintiff contends that Defendant's conduct constituted trafficking because Defendant was "otherwise benefitting" from all the services at the Port of Mariel, many of which are based on land confiscated from Plaintiff either through the confiscation of Maritima Mariel and its 1955 Concession or the confiscation of Azucarera Mariel and its land holdings on the west side of the Bay. *See id.* at 34-35.

### i.  Question of Law

The first critical issue is whether the 1955 Concession covered the entire Bay of Mariel – including the west side of the Bay where the Container Terminal, the DCV, and the TCM-Office are purportedly located – or limited to the area subject to the 1934 Concession – known as Punta Coco Solo on the east side of the Bay where the town of Mariel is located. In order to resolve that issue, the Court must address whether the dispute as to the geographic scope of the 1955

Concession is a question of law or a question of fact. The parties agree that the language of the 1955 Concession is unambiguous and, therefore, interpreting the 1955 Concession is a question of law for the Court, rather than a question of fact for the jury. *See* ECF Nos. [197] at 22-23, [219] at 15 n.13. The Court agrees. *See Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd.*, 882 F.3d 1033, 1039 (11th Cir. 2018) (holding that "contract interpretation is generally a question of law") (quoting *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995)).[13]

### ii.  Application of U.S. Law

Before interpreting the 1955 Concession, the Court must also address whether it should apply Cuban law or U.S. law. Defendant appears to rely on Diaz, who interpreted the scope of the 1955 Concession under Cuban law. *See* ECF No. [177] at 27. Plaintiff responds that the Court can ascertain from a plain reading of the 1955 Concession the geographic scope of the 1955 Concession without relying on experts. *See* ECF No. [197] at 22. According to Plaintiff, the Court need not look to expert opinions, which should be considered improper parole evidence. *See id.* at 22-23. Further, even if the Court considers expert opinions to ascertain the geographic scope of the 1955 Concession, it should apply U.S. law, not Cuban law, in interpreting the 1955 Concession. *See id.* at 24-26. As such, the Court should not consider Diaz's opinion regarding the geographic limitation of the 1955 Concession under Cuban law. Plaintiff argues, in the alternative, that if the Court were to look to expert opinions rather than the plain language of the 1955 Concession and

---

[13] Although Plaintiff submits that interpreting the 1955 Concession is a question of law, Plaintiff argues, in the alternative, that if the 1955 Concession is ambiguous, then the jury must resolve the factual dispute. *See* ECF No. [197] at 23. Defendant contends that if the 1955 Concession is ambiguous, then the Court can look to extrinsic evidence and determine the geographic scope of the 1955 Concession as a matter of law, as long as the extrinsic evidence is undisputed. *See* ECF No. [219] at 15 n.13. The parties' arguments in the alternative are inapposite because the 1955 Concession is unambiguous for the reasons stated below.

apply Cuban law to interpret the Concession, then Plaintiff's rebuttal experts demonstrate that Diaz misapplied Cuban law. *See id.* at 28-29. In the Reply, Defendant argues for the first time in a footnote that Cuban law should apply without meaningful analysis. *See* ECF No. [219] at 15 n.13.

As an initial matter, the Court agrees with both parties that the 1955 Concession is unambiguous, and it can look to the plain language of the 1955 Concession to determine the geographic scope of the 1955 Concession. Thus, it is not necessary or appropriate to consider the opinions of experts on this issue. As such, the Court does not consider Diaz's expert opinion on the matter. The Court also disregards the opinion of Plaintiff's expert Jean Paul Rodrigue ("Rodrigue"), who opines that there is no business case to be made for building a Maritime Terminal on the footprint of the 1934 Concession, and the 1955 Concession necessarily meant to grant rights to the entire Bay of Mariel. *See* ECF No. [178-30]. Moreover, the Court does not consider the opinions of Plaintiff's foreign law experts, Avelino Gonzalez ("Gonzalez") and Alejandro Auset Domper ("Domper"), whom Plaintiff relies on in the event the Court looks beyond the plain text of the 1955 Concession and applies foreign law. *See* ECF Nos. [201-3], [201-4].[14]

---

[14] The Court notes that several motions have been filed with respect to the expert witnesses, but none are relevant given the Court's determination above. First, Defendant filed a Motion to Strike Gonzalez and Domper's Declarations. *See* ECF No. [221]. The Court previously denied that aspect of the Motion to Strike, *see* ECF No. [256] at 16-21, but the Court does not consider their Declarations for the reasons stated above. Second, Plaintiff filed a *Daubert* Motion to preclude Diaz's opinion. *See* ECF No. [176]. Defendant also filed a *Daubert* Motion to preclude Rodrigue's opinion. *See* ECF No. [178-1]. However, *Daubert* motions address whether the jury, not the Court, should hear expert testimony. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) ("*Daubert* requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the *jury*." (emphasis added)). As such, arguments raised with regard to Diaz in Plaintiff's *Daubert* Motion and Rodrigue in Defendant's *Daubert* Motion are inapposite to the question of law before the Court. Further, as noted above, the Court need not consider their expert opinions or the *Daubert* Motions given that they provide parole evidence to interpret the unambiguous 1955 Concession.

Plaintiff contends that the Court should apply principles of contract interpretation under U.S. law. The Court agrees. Because subject matter jurisdiction in this case is based on a federal question, federal common law and the Restatement (Second) of Conflict of Laws ("Restatement") control the choice of law analysis. *See Nguyen v. JP Morgan Chase Bank, NA*, 709 F.3d 1342, 1345 (11th Cir. 2013); *Lola v. Skadden, Arps, Slate, Meagher & Flom LLP*, 620 F. App'x 37, 42 (2d Cir. 2015) ("Where jurisdiction is based on the existence of a federal question . . . we have not hesitated to apply a federal common law choice of law analysis."). Section 6 of the Restatement, in turn, states that courts should consider the following:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAW § 6 (AM. L. INST. 1971). The Restatement further states as follows:

(2) Contacts to be taken into account in applying the principles of s 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

*Id.* § 145(2) (AM. L. INST. 1971).

The Eleventh Circuit has instructed that courts should evaluate these contacts "'according to their relative importance with respect to the particular issue.'" *See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). Additionally, the first contact is generally the most important, as "absent special circumstances, '[t]he state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law.'" *Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1220 (S.D. Fla. 2008). In this case, the injury to Plaintiff occurred in Florida where Plaintiff is located. Although the injuring conduct – namely, trafficking – took place in Cuba, the injury caused by the injuring conduct was felt in Florida. Additionally, Plaintiff's domicile and Defendant's place of incorporation are both in the United States. *See* ECF No. [45] ¶¶ 16, 34. As such, the United States, not Cuba, has the most pertinent contact to assess the factors set forth in § 6 of the Restatement.[15]

Under § 6 of the Restatement, when comparing the relevant policies of the United States and those of Cuba, it is apparent the United States has a strong policy interest in adjudicating claims brought under the Helms-Burton Act, but Cuba does not. The United States also has a strong interest in having U.S. contract law principles govern the interpretation of contracts in U.S. federal courts. Cuba does not have a strong policy interest in having U.S. federal courts apply Cuban principles of contract interpretation. Plaintiff is further justified in expecting U.S. principles of contract interpretation to govern a claim brought under a U.S. statute in a U.S. federal court to recover damages prescribed by Congress. Furthermore, the Court is better equipped to apply U.S.

---

[15] To the extent that Plaintiff relies on Domper's Declaration applying Spanish law, the Court notes that there is little, if any, contact with Spain that justifies the application of Spanish law. *See* ECF No. [201-4].

principles of contract interpretation than Cuban principles of contract interpretation. As to the remaining factors – namely, the needs of the interstate and international systems; the basic policies underlying the particular field of law; and certainty, predictability, and uniformity of result – the Court has no reason to conclude, and Defendant fails to provide any reason why, those factors favor the application of Cuban law over U.S. law. As such, the relevant choice of law factors weigh in favor of the application of U.S. principles of contract interpretation. For this additional reason, the Court need not consider the opinions of Diaz who applies Cuban law, Gonzalez who also applies Cuban law, and Domper who applies Spanish law. *See* ECF Nos. [195-2], [201-3], [201-4].

### iii.  Geographic Scope of the 1955 Concession

The Court now turns to the merits of the parties' arguments, which can be resolved through the Court's interpretation of the unambiguous text of the 1955 Concession under U.S. law without relying on expert opinions, as noted above. Defendant argues that it did not traffic on land granted to Maritima Mariel in the 1955 Concession because the 1955 Concession did not include the land where the Container Terminal is located. *See* ECF No. [177] at 27-31. Plaintiff responds that the 1955 Concession included the entire Bay, including the land where the Container Terminal is located, because the text of the 1955 Concession has no geographic limitation within the Bay. *See* ECF No. [197] at 22-24.

The Court agrees with Defendant. The 1955 Concession is unambiguous and states, in relevant part, as follows:

> <u>Whereas</u>: Having seen the file processed by the Nacional [*sic*] Financing Agency of Cuba with regard to the applications made and projects submitted by "Marítima Mariel, S.A." for the financing of and authorization for the construction of different works such as walls, docks, warehouses, dredging, fillings-in, and others in low lands and mangroves of its property, and in the maritime-terrestrial zone of the littoral adjacent to such land plot of the ownership of "Marítima Mariel, S.A." in

the north coast of the province of Pinar del Rio, Bay of Mariel, Municipality of Mariel.

. . .

Whereas: "Marítima Mariel, S.A." has requested through the National Financing Agency of Cuba to be authorized to convert to public use the dock and warehouse located on land of its property which were legalized and authorized for private use by Presidential Decree No. 1655, of June 26, 1934, acquired by the deed of incorporation, converting said warehouses into public according to the provisions of the current Commercial Code.

. . .

First: A concession is granted to "Maritima Mariel, S.A." to plan, study, execute, maintain, and exploit public docks and warehouses in the bay of Mariel, Province of Pinar del Rio, and for the construction of new buildings and works, without detriment to the vested rights of third parties and entities by virtue of previous and current concessions for the same goals as those expressed in the paragraph herein.

By ministry of this Decree, the study, planning, execution, operation, and exploitation of the following works are declared of public interest, of social interest, and of public convenience:

A) The construction of a Maritime Terminal with new docks, containment walls, public warehouses, tanks, silos, ferry mooring piers, and other construction works in the Bay of Mariel, Province of Pinar del Rio, contained in the memory and maps filed by that entity with the National Financing Agency of Cuba and to the stated in the last paragraph of Part Third.

B) The draining, dredging, and filling-in of part of said Bay of Mariel, in the maritime and terrestrial-maritime zone, in the portions and parts indicated in the memory and maps referred to, needed for the construction, unfolding, operation, and exploitation of said project for a Maritime Terminal.

ECF No. [63-1] at 2, 4-5 (emphasis in original).

Based on a plain reading of the 1955 Concession, the Cuban Government granted the 1955 Concession in light of Maritima Mariel's application "for the construction of different works such as walls, docks, warehouses, dredging, fillings-in, and others in low lands and mangroves of [Maritima Mariel's] property" that Maritima Mariel had acquired through the "Presidential Decree No. 1655, of June 26, 1934," also known as the 1934 Concession. *Id.* It is further undisputed that

the 1934 Concession only grants rights to the docks in Punta Coco Solo on the east side of the Bay where the town of Mariel is located. *See* ECF Nos. [177-1] ¶ 36, [198] ¶ 36. As such, it is evident based on a plain reading of the 1955 Concession that when the Cuban Government granted the 1955 Concession "to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel," the Cuban Government was granting a concession with regard to the geographic scope prescribed in the 1934 Concession, namely Punta Coco Solo on the east side of the Bay where the town of Mariel is located. The reference to "public docks and warehouses in the Bay of Mariel" describes the general geographic location of the docks and warehouses at Punta Coco Solo, rather than expanding the scope of the 1955 Concession to the entire Bay of Mariel. Plaintiff's argument that the reference to the "Bay of Mariel" establishes a concession with respect to the entire Bay of Muriel would require the Court to effectively read out the "Whereas" clauses in the 1955 Concession. The Court declines to do so. The granting of "all the facilities" in the 1955 Concession is similarly limited by the phrase "to build said docks and warehouses," and does not grant Maritima Mariel all the facilities to the entire Bay without limit. ECF No. [63-1] at 3. Furthermore, the 1955 Concession states that Maritima Mariel is given the right to construct "*a Maritime Terminal*" in "*part of* said Bay of Mariel." ECF No. [63-1] at 4-5 (emphasis added). In sum, the 1955 Concession plainly does not grant Maritima Mariel the right to construct all of the maritime terminals in the entire Bay of Mariel.

Plaintiff's next argument that the 1955 Concession included other secondary rights that cover the surrounding areas beyond the land granted in the 1934 Concession is similarly unavailing. Plaintiff belies the 1955 Concession by arguing that Maritima Mariel was granted the rights to "occupy and use," "expropriate[e]," "evict," "convert," "expand," and "issue mortgage bonds" with respect to the entire Bay of Mariel. ECF No. [197] at 23-24. As a precursor to

providing the secondary rights, the 1955 Concession made clear that the secondary rights were being granted in light of "Part First" of the 1955 Concession quoted above. ECF No. [63-1] at 5. In addition, the enumerated rights include clauses that limit the scope of the secondary rights to works necessary to carry out the project described in the "Part First" – namely, the construction of "a maritime terminal" on the east side of the Bay. *See id.* at 5-6. The pertinent sections of the 1955 Concession are set forth in light of Plaintiff's selective reference to the secondary rights granted in the 1955 Concession:

> Second: The declaration of public utility contained in *Part First* entails the following rights in favor of the concessionary of the works:
>
> a) The temporary or permanent occupation and use of the empty lots and waters of public domain or of the State, the Province, or the Municipality's ownership *insofar as those be indispensably necessary for the execution and exploitation of the jobs and works of reference.*
>
> b) The power of condemnation by expropriation according to the Decree No. 595, of May 22, 1907 or to any subsequent regulation regarding the ownership, possession and use of any private real estate and ownership right whatever which shall be occupied for the works, uses and services dealt with in *Part First*; procedure that it may carry out also in relation to whatever right granted by the State, the Province, or the Municipality in relation with the maritime-terrestrial zone or the empty lots of public domain or of the ownership of said entities of the Nation.
>
> c) The right of imposing any type of easement on realty of private property for the construction of any type of ways of communications, access, movement and parking of vehicles, for the establishment of air or underground electric lines, for the laying of pipes and conductors of water, gas, ventilation and drainage, and in general *for whatever turn out to be inherent to or necessary for the goals of carrying out, maintaining and exploiting the works dealt with said paragraph First*, with the faculty of resorting also in these cases to expropriation as in the previous subsection.
>
> d) The right of evicting any leaseholder, sharecropper, tenants-at-sufferance, and otherwise tenants by any concept from any realty or installation that shall be temporarily or permanently occupied *for the works referred to in the aforesaid Part First*, paying to those so evicted a compensation equivalent to the sum of one year of the rent or lease that they pay in each lease.

. . .

Tenth: It is hereby granted and "Marítima Mariel, S.A." is hereby authorized to the conversion to the public service of the dock and warehouses with its modifications, expansions, and improvements the private use of which was *granted by Presidential Decree number 1655 of June 26, 1934*; being [the corporation] able to freely encumber and alienate all said properties according to provisions of . . . the Decree herein.

ECF No. [63-1] at 5-6, 8 (emphasis added).

The plain text of the 1955 Concession makes clear that the secondary rights were limited in scope to the first part of the 1955 Concession, which permitted the construction of a maritime terminal on the east side of the Bay in accordance with the 1934 Concession.[16] The 1955 Concession did not grant secondary rights to the entire Bay. Therefore, to the extent that Plaintiff's claims rest on the allegation that Defendant trafficked in the Container Terminal, which is located on the west side of Bay, and not on land covered in the 1955 Concession, the Court is not persuaded.[17]

### iv.  DCV and TCM-Office

Plaintiff's argument that Defendant trafficked in the DCV and TCM-Office, *see* ECF No. [197] at 30-34, requires additional analysis given that Plaintiff avers that the DCV and TCM-Office are located not only on land given in the 1955 Concession – an argument that is unavailing as noted above – but also on land that Azucarera Mariel owned and the Cuban Government confiscated. Plaintiff's argument is premised on the following allegations. First, the Blanco Rosell

---

[16] Plaintiff references the right to issue mortgage bonds using Maritima Mariel's properties as collateral. *See* ECF No. [197] at 24. The paragraph regarding mortgage bonds does not include a limiting clause, but it does not meaningfully advance Plaintiff's argument that the 1955 Concession granted rights to the entire Bay of Mariel. *See* ECF No. [63-1] at 7. Rather, a plain reading of the 1955 Concession as a whole indicates that the 1955 Concession granted the right to issue mortgage bonds with respect to Maritima Mariel's properties as set forth in the 1934 Concession on the east side of the Bay. *See id.*

[17] Although the exact scope of the Container Terminal is in dispute, the parties agree that the Container Terminal is located on the west side of the Bay. *See* ECF Nos. [177] at 26, [197] at 32-33, 35-36, [177-1] ¶ 60, [198] ¶ 60.

family purchased approximately 11,000 acres of land in the Bay of Mariel up to the border of the naval air station. Second, the Blanco Rosell family placed the title to the land in Azucarera Mariel. Third, the Cuban Government confiscated Azucarera Mariel. Fourth, DCV and TCM-Office are located on the 11,000 acres of land previously owned by the Azucarera Mariel. Fifth, Defendant trafficked in the DCV and TCM-Office or used the facilities to store empty containers through the actions of its agent Agencia Maritima Taina S.A. ("Taina").

Defendant argues that there is no evidence that Plaintiff or her family owned the land where the DCV and TCM-Office are located or that Defendant used the facilities through its agent Taina. *See* ECF No. [219] at 13-15. Defendant points out that Defendant's contract with Taina states that Taina is "[t]o issue . . . at the request of [Defendant] . . . bills of lading . . . as ***may be required*** by [Defendant] from time to time." *Id.* at 14 (quoting ECF No. [199-6] at 3-4) (emphasis in original). The contract merely contemplates a contingency in which Defendant may call upon Taina to issue bills of lading. The contract does not affirmatively require Taina to regularly issue bills of lading. Plaintiff provides no evidence that Defendant requested Taina to issue a bill of lading or that Taina did so. *See id.*

Upon review of the record, the Court agrees with Plaintiff to the extent that there is evidence for the jury to find that Plaintiff or her family owned approximately 11,000 acres of land, that some of the land is located in the Bay of Mariel and was placed in Azucarera Mariel, and that the Cuban Government confiscated Azucarera Mariel. Plaintiff cites Exhibits 52, 53, 54, and 78 for her proposition that her family purchased the land and placed it in Azucarera Mariel. Exhibits 52 and 53 set forth assets owned by Central San Ramon and then subsequently by Azucarera Mariel. *See* ECF Nos. [198-9], [198-10]. Exhibit 54 suggests that "'San Ramón' Central belonged to the Balsinde family until after the harvest of 1949, in which it was sold to [Plaintiff's father]."

ECF No. [198-11] at 19; *see also* ECF No. [200-8]. Plaintiff further provided evidence, through Edmonds' original expert reports, which have not been stricken or challenged in any of the pending motions, that some of the land holdings are located in the area surrounding the naval air station on the west side of the Bay and outside of the Container Terminal as defined by Defendant. *See* ECF Nos. [178-27] at 19, [200-12] at 22.

However, while Plaintiff has provided evidence of her ownership claim to the area surrounding the naval air station, the Court has stricken Edmonds' subsequent declarations pinpointing the locations of the DCV and TCM-Office. *See* ECF No. [256] at 6-9. As a result, Plaintiff provides no evidence for the jury to find that the DCV and TCM-Office are located on the 11,000 acres of land or other land previously owned by Azucarera Mariel. Therefore, any argument that Defendant or Taina used the DCV or TCM-Office to traffic, or otherwise stored empty containers, is unavailing without evidence of where the two facilities are located. The Court further notes that there is no evidence that Defendant used the DCV or TCM-Office to store empty containers, as opposed to the Container Yard. *See* ECF No. [199-12] at 44. The only evidence indicating where the empty containers are stored suggests that they were stored in the Container Yard located in the Container Terminal as defined by Plaintiff. *See* ECF No. [180-3] at 53 (testifying that the Container Yard is located "alongside the berth . . . where the ship rests along the terminal.").

As such, Plaintiff's argument on this matter is unavailing.

### v. Geographic Scope of Container Terminal

Lastly, Plaintiff argues that the geographic scope of the Container Terminal itself is in dispute. Plaintiff submits that the Container Terminal extends beyond Defendant's definition of the Container Terminal and includes land beyond the naval air station – land to which Plaintiff has

a claim via her stake in Azucarera Mariel. For ease of reference, the Court refers to Defendant's narrow definition of the Container Terminal as the "Purple Box Container Terminal," *see* ECF No. [177] at 26, and Plaintiff's definition of the larger Container Terminal as the "Grey Box Container Terminal," *see* ECF No. [202-6] at 2. The Court also reproduces two maps: the first from Defendant's Motion depicting the Purple Box Container Terminal, *see* ECF No. [177] at 26, and the second from Plaintiff's exhibit depicting the Grey Box Container Terminal, *see* ECF No. [202-6] at 2.

Figure 1: Purple Box Container Terminal



Case No. 20-cv-25176-BLOOM/Otazo-Reyes

Figure 2: Grey Box Container Terminal



Following Plaintiff's logic, even if the 1955 Concession did not include the Bay of Mariel

and even if Plaintiff cannot pinpoint the locations of the DCV and TCM-Office, Plaintiff has

offered evidence that Plaintiff has a claim to the area west of the Bay through Azucarera Mariel's

confiscated land holdings. Plaintiff has, therefore, presented sufficient evidence that she has a

claim to the property in which Defendant trafficked by virtue of Defendant or its agent Taina's

actions in the Grey Box Container Terminal. In support, Plaintiff specifically cites the "Container

Terminal" as defined in Defendant's contract with Terminal de Contenedores de Mariel S.A

("TCM"). *See* ECF No. [199-12] at 5 ("'Container Terminal' means the Container terminal at the

port stated in the Preamble hereof together with the Container yard and all other equipment and

buildings at the said terminal, whether constructed or under construction, together with any additional land, berths, buildings and Container yards to be installed in connection with any further developments thereto for the purpose of providing Container terminal services by [TCM].")." Plaintiff also relies on two maps of the Container Terminal purportedly extending beyond the Purple Box Container Terminal, one of which has been reproduced above. *See* ECF Nos. [202-6] at 2, [202-5] at 2. In addition, Plaintiff quotes Diaz's deposition in which she defines the Container Terminal as being 702 meters long and 27.09 meters wide. *See* ECF No. [181-12] at 122. Plaintiff further relies on Rodrigue's opinion on the scope of the Container Terminal. *See* ECF No. [198] at 7-8 (citing ECF No. [178-30]).

Defendant replies that Plaintiff's arguments regarding the disputed geographic scope of the Container Terminal are unavailing in light of Plaintiff's own expert's testimony that the Container Terminal was accurately depicted in maps confining the Container Terminal to the area of the Purple Box Container Terminal. *See* ECF No. [219] at 14 (citing ECF No. [184-1] at 134, 148-49, 190, 193, 203, 208). Defendant submits that the Container Terminal is confined to the naval air station, which the Cuban Government purchased from the Balsinde family, and land to which Plaintiff never had a claim through either Maritima Mariel or Azucarera Mariel. Defendant further argues that there is no evidence that Defendant or its agent trafficked in land outside the Purple Box Container Terminal.

The Court agrees with Plaintiff to the extent that the definition of the Container Terminal is in dispute in light of the maps provided by Plaintiff depicting a larger Container Terminal, *see* ECF Nos. [202-6] at 2, [202-5] at 2. However, the definition of the Container Terminal is not a material fact unless Plaintiff can offer evidence that Defendant trafficked in the Grey Box Container Terminal. Defendant claims that its activity was constrained to the "water's edge" of the

Purple Box Container Terminal or the Purple Box Container Terminal itself, not the Grey Box

Terminal Container. ECF No. [177] at 23-24. The Court agrees that there is no evidence indicating

that Defendant trafficked in the area outside the Purple Box Container Terminal. As such, even if

the Court were to draw all reasonable inferences in favor of Plaintiff and conclude that the

Container Terminal includes area beyond the naval air station, in keeping with Plaintiff's Grey

Box Container Terminal, Plaintiff nonetheless fails to provide any evidence that Defendant

trafficked in the area outside of the Purple Box Container Terminal and on land to which Plaintiff

has a claim via Azucarera Mariel.

The contract between Defendant and Taina is not evidence of trafficking in areas outside

the Purple Box Container Terminal and in the Grey Box Container Terminal. The contract lists

Taina's duties as follows:

a. <u>General Duties:</u>

i.   To perform for the Principal, professionally and in accordance with the highest industry standards, best practices and the Principal's procedures, requirements and directions, as the Principal shall inform the Agent *from time to time*, all customary services of a shipping company's agent within the Territory,[18] including, but not limited to, commercial agency work, communication and coordination with port/vessel agents, stevedore and terminal operator(s), the handling of all Principal's Equipment and otherwise all other services required by the Principal.

ii.  To issue, on behalf of the Principal, and at the request of Principal in connection with connecting carriage or vessel sharing partners, bills of lading and manifests, documents requested by authorities at both ends of voyages or at transshipments ports, delivery orders, certificates and such other documents *as may be required by Principal from time to time*. The Agent shall carry out the above mentioned duties in accordance with Principal's procedures or instructions as updated from time to time.

iii. To represent the Principal and/or its affiliated and/or subsidiary and/or associated companies, *vis-à-vis* local authorities, port authorities or any additional body in the Territory that the Principal *may from time to time*

---

[18] Territory is defined as "the country of Cuba." ECF No. [199-6] at 3.

*request*, using its best endeavours to comply at all times with any reasonable [*sic*] specific instructions with the Principal may give.

iv.   *If required by the Principal* and on its behalf and account, to make and receive all necessary payments with the Principal's prior written consent.

v.   *Any case of an emergency or breakdown* of the Agent's services to the Principal of whatsoever nature shall be immediately reported to the Principal.

vi.   The Agent shall keep the Principal fully updated and informed as to any local compulsory procedures, laws, regulations, restrictions and limitations applied or imposed upon imported/exported goods, their storage, vessels and equipment which may impose upon the Principal any extraordinary burden, financial, commercial, legal or otherwise, and which may be prevented, diminished or duly handled beforehand by proper advice and handling.

vii.   The Agent has no authority to bind the Principal in any agreement and/or contract for any purpose whatsoever unless such authority is specifically granted by the terms of this Agreement and/or shall be specifically granted in writing to the Agent.

. . .

b.   Equipment:

. . .

iv.   To make seaworthy Equipment available for shippers and to arrange inland haulage according to documents, as required, and according to Shipper's instructions as undertaken in the agreement with them.

ECF No. [199-6] at 3-4 (emphasis added).[19]

As Defendant correctly argues, the contract between Defendant and Taina sets forth several conditional clauses, and such clauses do not constitute evidence that Defendant activated the clauses and required Taina to carry out its duties in the Container Terminal. *See id.* Even if Defendant activated the conditional clauses, there is no indication that Taina fulfilled its duties in

---

[19] The Court notes that additional duties are listed in Section 3(b)-(d) of the contract. *See* ECF No. [199-6] at 4-6. The Court does not reproduce the duties here for brevity.

the Grey Box Container Terminal, as opposed to the Purple Box Container Terminal. There is also no evidence indicating that any of the non-conditional duties – such as making payments, informing Defendant of service breakdowns, and making equipment available – required Taina's presence on the Grey Box Container Terminal, as opposed to the Purple Box Container Terminal. The only reference to a geographical location in the contract is a reference "Territory[,]" which is defined as the "country of Cuba." ECF No. [199-6] at 3. Without any further indication in the contract or elsewhere that required Taina to perform its duties in the Grey Box Container Terminal, any argument that Taina performed its duties in the Grey Box Container Terminal, as opposed to the Purple Box Container Terminal, would be speculation unsupported by any evidence. Such speculation is not sufficient "evidence on which a jury could reasonably find for [Plaintiff]" to survive summary judgment. *Anderson*, 477 U.S. at 252.

Finally, Plaintiff's reliance on an excerpt from Defendant's corporate representative's deposition regarding Taina's activity is unavailing. *See* ECF No. [197] at 31 (citing ECF No. [180-3] at 52-53). The excerpt merely indicates that Taina is Defendant's agent and that Taina discharged loads at Defendant's definition of the Container Terminal, namely the Purple Box Container Terminal, not the Grey Box Container Terminal. Plaintiff omits Defendant's corporate representative's description of Taina's duties on the Container Terminal as being confined to the Container Yard that is "half a football field" and located "alongside the berth[,]" which aligns with the size and location of the Purple Box Container Terminal, as opposed to the Grey Box Container Terminal. ECF No. [180-3] at 53-54.[20]

---

[20] To the extent that Plaintiff argues that Defendant "otherwise benefits from confiscated property" by benefitting from port facilities outside the Purple Box Container Terminal, including the DCV and TCM-Office, *see* ECF No. [197] at 34-35, the Court again notes that there is no evidence to indicate that the DCV, TCM-Office, or any other port facilities are located outside the Purple Box Container Terminal and on land which Azucarera Mariel previously owned.

In sum, there is no evidence that Plaintiff has an ownership interest in the property in which Defendant purportedly trafficked, and Defendant is entitled to summary judgment on this matter.[21]

### vi. Trafficking

Given the Court's determination that there is no evidence that Plaintiff owned the property in which Defendant purportedly trafficked, the Court need not address whether Defendant's conduct constitutes trafficking under the Act.

### C. Scienter

Given the Court's determination that there is no evidence that Plaintiff owned the property in which Defendant purportedly trafficked, the Court also need not address whether Defendant "knowingly and intentionally" trafficked.

### D. ZEDM

The Court next addresses the parties' arguments with regard to ZEDM, given that Plaintiff provided sufficient evidence that she has a claim to land on the west side of the Bay via Azucarera Mariel's land holdings. As an initial matter, the Court must set forth the meaning of ZEDM. The parties appear to refer to ZEDM as both a physical location and as an agency of the Cuban Government. *See* ECF No. [45] ¶ 82 (referring to ZEDM as "an agency or instrumentality of the

---

[21] Given that there is no evidence of Defendant or Defendant's agent trafficking in the Grey Box Container Terminal, the Court need not go further. However, the Court notes that other than the two maps provided by Plaintiff to place the geographic scope of the Container Terminal in dispute, Plaintiff provides no other evidence to raise a genuine issue of material fact with regard to the geographic scope of the Container Terminal. First, Plaintiff's reliance on Diaz's testimony to argue that Defendant concedes that the geographic scope of the Container Terminal includes the Grey Box Container Terminal is unavailing. Diaz never opines on the location of the Container Terminal and expressly references two maps in her report that do not indicate that the scope of the Container Terminal extends beyond the Purple Box Container Terminal. *See* ECF No. [181-12] at 122 (citing ECF No. [195-2] at 18, 20). Second, Rodrigue's opinion similarly does not discuss on the geographic scope of the Container Terminal. *See* ECF No. [178-30]. Third, the definition of the Container Terminal as set forth in the contract between Defendant and TCM merely includes the Container Yard, which appears to be located in the Purple Box Container Terminal as noted above, *see* ECF No. [180-3] at 53, and other unspecified facilities whose locations are not provided by any evidence, *see* ECF No. [199-12] at 5.

Cuban Government" and also a "special economic zone in Cuba"). For clarity, the Court refers to the physical location as the "Zone" and the Cuban Government entity as "ZEDM." Next, the Court reiterates that Plaintiff has set forth evidence that she has a claim to 11,000 acres of land via Azucarera Mariel, some of which is in the Bay of Mariel near the naval air station, *see* ECF Nos. [178-27] at 19, [200-12] at 22, and evidence that the Zone covers broad areas near the Bay of Mariel, including the area around the naval air station, *see* ECF No. [45] at 23. As such, there is sufficient evidence for a jury to find that the Zone includes areas confiscated by the Cuban Government when it confiscated Azucarera Mariel.

Against this background, Defendant argues that there is no evidence that Defendant trafficked indirectly through the ZEDM and no evidence that Defendant otherwise trafficked in the Zone. *See* ECF No. [177] at 37-39. Plaintiff does not meaningfully respond to the argument that Defendant did not indirectly traffic through ZEDM and instead submits that Defendant trafficked indirectly through TCM, which in turn traffics in the Zone. *See* ECF No. [197] at 36-38. As before, the Court notes that the parties refer to TCM as the facility known as the Mariel Container Terminal Office and also an entity that allegedly traffics in the Zone. For clarity, the Court reiterates that "TCM-Office" refers to the facility, as it has in the previous section discussing the Mariel Container Terminal Office, and "TCM" as the entity that allegedly traffics in the Zone, also known as the Terminal de Contenedores de Mariel S.A. Defendant replies that Plaintiff's new theory that Defendant indirectly trafficked through TCM is not alleged in the Amended Complaint and that there is no evidence that TCM trafficked in the Zone. *See* ECF No. [219] at 20-21.

First, Plaintiff's argument that Defendant trafficked through the ZEDM is unsupported. Despite alleging in her Amended Complaint that Defendant "engaged in commercial transactions with the . . . Zona Especial De Desarollo Mariel ('ZEDM')[,]" ECF No. [45] ¶ 11, Plaintiff fails

to provide any evidence that Defendant trafficked through the actions of ZEDM. Plaintiff notably does not dispute that there is no evidence that ZEDM – as an entity – engaged in any trafficking conduct that benefited Defendant. *See generally* ECF No. [197].

Second, Plaintiff's contention that Defendant trafficked in the Zone directly through its own conduct on the Container Terminal is also unsupported. The Court reiterates that any argument that Defendant trafficked in the Purple Box Container Terminal is unpersuasive since the Purple Box Container Terminal is not located on land that was a part of the 1955 Concession or on the 11,000 acres previously held by Azucarera Mariel. As such, any conduct on the Purple Box Container Terminal, while taking place in the Zone, is not grounds for liability under the Act. Although the Grey Box Container Terminal is in the Zone and part of the 11,000 acres of land previously held by Azucarera Mariel, there is no evidence that Defendant trafficked outside the Purple Box Container Terminal and in the Grey Box Container Terminal. Moreover, any argument that Defendant trafficked in the DCV and TCM-Office is unavailing because Plaintiff has failed to provide any evidence to establish where the DCV and TCM-Office are located, much less to establish that they are in the Zone.

Third, regarding the argument that Defendant trafficked in the Zone indirectly through TCM, the Court first notes that Plaintiff appears to set forth a new theory of liability based on TCM, which is not alleged in the Amended Complaint. *See generally* ECF No. [45]. This alone is fatal to Plaintiff's argument on the matter. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). Nonetheless, even if the Court were to allow Plaintiff to raise a new theory of liability, Plaintiff

provides no evidence that TCM trafficked in the Zone. Section 2.1 of the contract between Defendant and TCM states that "[TCM] will provide [Defendant] with the Terminal Services induced in Appendix 1 and other services approved in its constitution, which *may be demanded* by the [Defendant] during the validity of this Contract and the [Defendant] compels itself to pay [TCM] the corresponding amounts in accordance with the rates, terms and other conditions established on this Contract." ECF No. [199-12] at 8 (emphasis added). Similar to the contract between Defendant and Taina, the contract between Defendant and TCM includes a conditional clause that does not suffice as evidence that Defendant actually invoked the clause requiring TCM to perform its duties in the Container Terminal. Further, even if Defendant invoked the clause or other provisions that required TCM's action, there is no evidence that TCM performed its contractual duties in the Grey Box Container Terminal as opposed to the Purple Box Container Terminal. The definition of the Container Terminal as set forth in the contract is limited to the Container Yard, which appears to be located in the Purple Box Container Terminal as noted above, *see* ECF No. [180-3] at 53, and other unspecified facilities, whose locations are not provided by any evidence, *see* ECF No. [199-12] at 5.

As such, Plaintiff's argument that Defendant trafficked in the Zone directly or indirectly through the ZEDM or TCM also does not provide a basis for relief for Plaintiff under the Act.[22]

---

[22] The Court notes that Defendant's expert Diaz opines that ZEDM and TCM are different legal entities. *See* ECF No. [195-2] at 9. However, whether ZEDM and TCM are distinct legal entities according to Defendant's expert is inapposite to the Court's analysis above. Even if the Court were to assume that ZEDM and TCM are the same entity, the fact remains that Plaintiff cannot provide any evidence that Plaintiff trafficked in the Zone directly or indirectly through the actions ZEDM or TCM as noted above. As such, the Court need not rely on Diaz's opinion or address Plaintiff's *Daubert* Motion seeking to exclude Diaz's opinion. *See* ECF Nos. [195-2], [176].

Case No. 20-cv-25176-BLOOM/Otazo-Reyes

### E. Damages

Given the Court's determination that there is no evidence that Plaintiff owned the property in which Defendant purportedly trafficked, the Court need not reach the issue of damages.[23]

### F. Lawful Travel Exception

Given the Court's determination that there is no evidence that Plaintiff owned the property in which Defendant purportedly trafficked, the Court need not address whether the lawful travel exception applies.[24]

## V.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion, **ECF No. [177]**, is **GRANTED**.

2. The above-styled case is **DISMISSED WITH PREJUDICE**.

3. To the extent not otherwise disposed of, all pending motions are **DENIED AS MOOT** and all deadlines are **TERMINATED**.

4. The Clerk of Court is directed to **CLOSE** this case.

---

[23] To the extent that Plaintiff's experts Lori Wolin ("Wolin"), Jose Alberro ("Alberro"), Harold Martin ("Martin"), and Timothy Riddiough ("Riddiough"), and Defendant's expert Diaz seek to opine on damages, their opinions are not pertinent because the Court need not reach the issue of damages. *See* ECF Nos. [142-1], [142-2], [178-2], [178-4], [194-3], [194-4], [253]. The Court also need not consider Defendant's *Daubert* Motion seeking to exclude Wolin and Alberro, or the Motion to Strike Supplemental Expert Report of Lori Wolin. *See* ECF Nos. [178-1], [142]. The Court further notes that the Court has already stricken the Declarations of Martin and Riddiough. *See* ECF No. [256] at 14-16.

[24] To the extent that Plaintiff's experts Susan Hutner ("Hutner"), Nathan Sales ("Sales"), Matthew Levitt ("Levitt"), and Douglas Jacobson ("Jacobson"), and Defendant's expert Barbara Linney ("Linney") seek to opine on issues related to the lawful travel exception, their opinions are not pertinent because the Court need not address the lawful travel exception. *See* ECF Nos. [178-31], [178-16], [201-8], [201-16], [195-16]. As before, the Court also need not consider Defendant's *Daubert* Motion seeking to exclude Hutner, Sales, and Levitt, or Plaintiff's *Daubert* Motion seeking to exclude Linney. *See* ECF Nos. [178-1], [176]. The Court has already stricken the Declaration of Jacobson. *See* ECF No. [256] at 9-11.

Case No. 20-cv-25176-BLOOM/Otazo-Reyes

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 19, 2022.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record